TELEPHONE NEWS SYSTEM, INC., an Illinois corporation, Plaintiff,

v.

ILLINOIS BELL TELEPHONE COMPANY, an Illinois corporation, Defendant, United States of America, Intervenor-Defendant.

Civ. A. No. 62 C 941.

United States District Court
N. D. Illinois, E. D.

Aug. 14, 1963.

Thomas D. Nash, Jr., Robert M. Ahern, Chicago, Ill., for plaintiff.

Walter J. Cummings, Jr., David H. Ward, Chicago, Ill., for defendant.

Herbert J. Miller, Jr., Asst. Atty. Gen., Edward T. Joyce, Herbert W. Titus, Attys., Dept. of Justice, James P. O'Brien, U. S. Atty., for United States, intervenor-defendant.

Before HASTINGS, Circuit Judge, and JULIUS J. HOFFMAN and WILL, District Judges.

JULIUS J. HOFFMAN, District Judge.

Since 1956, plaintiff, Telephone News Systems, Inc., has operated a telephone service supplying certain horse racing information to anyone calling its telephone number. Plaintiff receives the information over a "Sports Printer" leased from United Press International News Service and makes voice recordings several times a day, which recordings are heard by those calling plaintiff's number. (See Telephone News System, Inc. v. Illinois Bell Tel. Co., 210 F.Supp. 471 (N.D.Ill.1962), an earlier opinion in this case.)

On April 25, 1962, Herbert J. Miller, Jr., Assistant Attorney General in charge of the Criminal Division of the Department of Justice, sent a letter to the Illinois Bell Telephone Company representing that information in the files of the Department of Justice revealed that telephone facilities located at plaintiff's place of business were being and would be used for transmitting and receiving gambling information in violation of federal law. The letter stated that pursuant to title 18 U.S.C. § 1084(d), the telephone company was required to discontinue the leasing of these facilities, after reasonable notice to the subscriber; it suggested that five days' notice would constitute reasonable notice under the circumstances. On April 27, 1962, the telephone company notified plaintiff by letter that in compliance with the Department of Justice directive, plaintiff's telephone service would be discontinued on May 5, 1962. Plaintiff instituted this proceeding on May 4, 1962, praying that the Illinois Bell Telephone Company be enjoined from discontinuing service to plaintiff. The United States of America, alleging that it is the real party in interest, has been allowed to intervene as a defendant. Pending a final determination of plaintiff's prayer for a permanent injunction, this Court entered a temporary restraining order preventing removal of plaintiff's telephone facilities.

The case was submitted to the Court on the pleadings, stipulations of facts, and documents admitted into evidence. After hearing arguments and examining the briefs filed by counsel, the Honorable Hubert L. Will found that plaintiff was using its telephone facilities in violation of section 28–1(a) (10) of the Illinois Criminal Code of 1961, Ill.Stat. Ann. c. 38, § 28–1(a) (10) (1961), and that consequently discontinuation of its telephone service was required by title 18 U.S.C. § 1084(d). Telephone News System, Inc. v. Illinois Bell Telephone Co., supra. The Court further determined, however, that plaintiff had raised a substantial question concerning the constitutionality of section 1084(d) and, pursuant to title 28 U.S.C. § 2282, 2284, directed that a three-judge court be convened to consider the constitutional objections raised by plaintiff.

Section 1084(d) provides as follows:

"When any common carrier, subject to the jurisdiction of the Federal Communications Commission, is notified in writing by a Federal, State, or local law enforcement agency, acting within its jurisdiction, that any facility furnished by it is being used or will be used for the purpose of transmitting or receiving

gambling information in interstate or foreign commerce in violation of Federal, State or local law, it shall discontinue or refuse, the leasing, furnishing, or maintaining of such facility, after reasonable notice to the subscriber, but no damages, penalty or forfeiture, civil or criminal, shall be found against any common carrier for any act done in compliance with any notice received from a law enforcement agency. Nothing in this section shall be deemed to prejudice the right of any person affected thereby to secure an appropriate determination, as otherwise provided by law, in a Federal court or in a State or local tribunal or agency, that such facility should not be discontinued or removed, or should be restored."

Section 28–1(a) (10) of the Illinois Criminal Code provides that a person commits illegal gambling when he

"[k]nowingly transmits information as to wagers, betting odds, or changes in betting odds by telephone, telegraph, radio, semaphore or similar means; or knowingly installs or maintains equipment for the transmission or receipt of such information."

Plaintiff contends that both of these provisions violate the United States Constitution.

## I. CONSTITUTIONALITY OF § 1084(d)

The plaintiff asserts that section 1084(d) is unconstitutional (1) because of vagueness, (2) because it authorizes the prosecution of crimes under the guise of a civil remedy, and (3) because it deprives the telephone subscriber of its remedies for wrongful termination of service.

**1.** *Contention That Provision Is Void Because of Vagueness*

Plaintiff contends that section 1084(d) creates a hitherto unknown offense of transmitting or receiving "gambling information" over wire communication fa-

cilities, and that neither the section itself nor the statute as a whole supplies any standards for determining what constitutes "gambling information," but delegates the definition of this term to the agencies charged with enforcement of this provision. Plaintiff, quoting from, Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926), asserts that "men of common intelligence must necessarily guess at its meaning and differ as to its application." Plaintiff asserts that the term can include almost any type of information, including, for example, the physical condition of a hockey team, the weather conditions on the day of a football game, or "stale" information about a sporting event or contest.

■■ A statute is void where it is so vague as to embrace acts which it is unreasonable to presume were intended to be made subject to its sanctions. Cf. Herndon v. Lowry, 301 U.S. 242, 258–259, 57 S.Ct. 732, 81 L.Ed. 1066 (1937). The difficulty with plaintiff's argument is that plaintiff incorrectly assumes that section 1084(d) creates an offense of transmitting or receiving gambling information in interstate or foreign commerce. This provision, however, creates no offense. Whether the transmission or receiving of information about the weather or the physical condition of a team prior to a sporting event is a crime under given circumstances is to be determined not by reference to the term "gambling information" in this provision, but by reference to federal, state, and local criminal laws which proscribe the sending or receiving of gambling information over wire communications facilities. Section 1084(d) provides for discontinuation of communication services that are put to certain unlawful uses.

■■ The fifth amendment forbids the taking of property without due process of law. It seems probable that one's right to telephone service is a property right within the protection of this amendment, inasmuch as under the common law and most utility statutes a public

utility must serve all members of the public without unreasonable discrimination. See Andrews v. Chesapeake & Potomac Tel. Co., 83 F.Supp. 966 (D.D.C. 1949); Fay v. Miller, 87 U.S.App.D.C. 168, 183 F.2d 986 (1950). The requirement of due process includes the requirement that a statute penalizing conduct must give fair notice of what conduct is proscribed, or it is void for "indefiniteness." Winters v. New York, 333 U.S. 507, 524, 68 S.Ct. 665, 92 L.Ed. 840 (1948) (Frankfurter, J., dissenting).

The concept of vagueness or indefiniteness is most often employed with respect to criminal provisions. The requirement as applied to a criminal statute has been described by the United States Supreme Court, in a frequently quoted passage, as follows:

"A criminal statute must be sufficiently definite to give notice of the required conduct to one who would avoid its penalties, and to guide the judge in its application and the lawyer in defending one charged with its violation. But few words possess the precision of mathematical symbols, most statutes must deal with untold and unforeseen variations in factual situations, and the practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions. Consequently, no more than a reasonable degree of certainty can be demanded. Nor is it unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line." Boyce Motor Lines, Inc. v. United States, 342 U.S. 337, 340, 72 S.Ct. 329, 330, 331, 96 L.Ed. 367 (1952). (Footnotes omitted.)

With regard to non-criminal provisions, the Court has said, "The standards of certainty in statutes punishing for offenses is higher than in those depending primarily upon civil sanctions for enforcement." Winters v. New York, 333 U.S. 507, 515, 68 S.Ct. 665, 670, 92 L.Ed. 840 (1948).

■■ In examining a statutory provision challenged as vague and indefinite, the federal courts must determine whether the provision contains sufficient standards to identify the conduct to which the penalty applies, and in so doing the court is guided by the provision itself as read in the context of the entire statute, and by the nature of the subjects with which the statute is concerned. Connally v. General Construction Co., 269 U.S. 385, 391–392, 46 S.Ct. 126, 70 L.Ed. 322 (1926). Moreover, the court, in maintaining a proper perspective of its role in the review of legislation challenged as unconstitutional, must appreciate that the drafting of legislation calls for a type of judgment "peculiarly within the responsibility and the competence of legislatures." Winters v. New York, 333 U.S. 507, 526, 68 S.Ct. 665, 675, 92 L.Ed. 840 (1948) (Frankfurter, J., dissenting). Accordingly, the language of Congress is not easily held "indefinite." It is appropriate to consider what problem Congress was dealing with, in enacting the provision in question, and why Congress chose the language enacted. Cf., Boyce Motor Lines v. United States, 342 U.S. 337, 341–342, 72 S.Ct. 329, 96 L.Ed. 367 (1952).

■ Section 1084(d) gives fair notice of the type of conduct which will give rise to the discontinuation of telephone service. It contains sufficient standards to show what type of criminal offense will give rise to its application.

The statute in which subsection (d) appears provides some indication of what Congress had in mind in using this term. Subsection (a) of Section 1084 provides as follows:

"Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or

credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers, shall be fined not more than $10,000 or imprisoned not more than two years, or both."

In this subsection, Congress gave a specific example of the kind of criminal offense it meant to comprise in subsection (d).

Subsection (b) of this section specifically exempts certain types of transmissions—those of information for use in news reporting and those sent from a state where the betting is legal to another state where betting is legal.

The legislative history of section 1084 clearly shows the evil which Congress meant to suppress by this provision. The House Committee on the Judiciary reported, with respect to this section, as follows:

"Testimony before your Committee on the Judiciary revealed that modern bookmaking depends in large measure on the rapid transmission of gambling information by wire communication facilities. For example, at present the immediate receipt of information as to results of a horserace permits a bettor to place a wager on a successive race. Likewise, bookmakers are dependent upon telephone service for the placing of bets and for layoff betting on all sporting events. The availability of wire communication facilities affords opportunity for the making of bets or wagers and the exchange of related information almost to the very minute that a particular sporting event begins."

The Committee further stated,

"The purpose of the bill is to assist the various States and the District of Columbia in the enforcement of their laws pertaining to gambling, bookmaking, and like offenses and to aid in the suppression of organized gambling activities by prohibiting the use of wire communication facilities which are or will be used for the transmission of bets or wagers and gambling information in interstate and foreign commerce." H.R.Rep. No. 967, 87th Cong., 1st Sess. (1961), U.S.Code Congressional and Administrative News 1961, p. 2631.

Thus, the principal problem with which Congress was dealing was the suppression of professional gambling activities. It has often been stressed in recent years that the threat of organized crime is difficult to combat on the state or local level, because it frequently crosses jurisdictional lines. Johnson, Organized Crime: Challenge to the American Legal System (Part I), 53 J.Crim.L., C. & P.S. 399, 418–19 (1962). And its communications are often beyond the reach of state and local law enforcement, because they are frequently interstate. Id., (Part II), 54 J.Crim.L., C. & P.S. 1, 27 (1963). Organized gambling, particularly bookmaking, is highly dependent upon rapid communications. ABA Report on Organized Crime and Law Enforcement 84 (1952); Bachelder, The Suppression of Bookie Gambling by a Denial of Telephone and Telegraph Facilities, 40 J. Crim.L., C. & P.S. 176 (1949). Thus Congress considered that denial of wire communication facilities to support such gambling activities would be an effective way to curtail such activities.

The states, as well as the federal government, have employed regulation of communication facilities as a means to curtail professional gambling activities, particularly off-track betting, and a number of states have enacted statutes or adopted administrative procedures to prohibit the transmission of information with intent that it be used in a gambling operation, to ban racing information for a given period of time after a race, or to deny wire services where the services are used to further commercial gambling activities. Johnson, (Part II), supra at 27; Bachelder, supra.

In light of the history of this effort to combat professional gambling activities, the language of subsection (d) clearly identifies the type of federal,

state, or local criminal offense meant to be included. With due regard to the context of the statute, the nature of the subject matter dealt with, and the history of the legislation, we may say that facilities are used to transmit or receive gambling information in violation of federal, state, or local law, when those facilities are used in violation of a federal, state, or local law which proscribes the transmitting or receiving of information relating to or assisting in the placing of bets or wagers.

It is difficult to conceive of a criminal statute which would not clearly fall within or without subsection (d), and while plaintiff has referred to types of *information* which might or might not be "gambling information," it has not referred to any type of *statute* which might or might not proscribe the transmission or receiving of gambling information. We therefore conclude that section 1084 (d) is sufficiently precise in its terms to satisfy the constitutional requirement of definiteness.

■ Plaintiff has further contended that incorporation by reference of laws not yet enacted is fatal to the provision. Plaintiff cites certain state decisions in support of this contention, but the federal rule is that legislative imposition of sanctions for conduct proscribed by other legislation, including legislation subsequently enacted, does not violate the constitutional requirement of due process. United States v. Sharpnack, 355 U.S. 286, 78 S.Ct. 291, 2 L.Ed.2d 282 (1958).

2. *Contention That § 1084(d) Authorizes the Prosecution of a Crime Under the Guise of a Civil Remedy*

Plaintiff makes a three-pronged argument that section 1084(d) authorizes governmental prosecution of crimes in civil proceedings: (1) it contends that the procedure authorized by section 1084 (d) results in the denial to plaintiff of its privilege against self-incrimination; (2) it contends that section 1084(d) imposes penal sanctions without the constitutional procedures required for conviction of

a crime; and (3) it contends that section 1084(d) provides for the trial of state crimes in federal courts and for the trial of federal crimes in state courts.

(a) With regard to the first of these contentions, plaintiff maintains that section 1084(d) places one threatened with discontinuation of telephone service upon the horns of a dilemma: he must either suffer discontinuation of his service, or he must file a petition under oath in order to prevent discontinuation. The affected subscriber, plaintiff claims, is therefore denied his privilege against self-incrimination.

■ There are two short answers to this contention. First, plaintiff is a corporation, and it is well settled that a corporation is not protected by the privilege against self-incrimination. Oklahoma Press Pub. Co. v. Walling, 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946); Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771 (1911). Second, the procedures followed by the courts in section 1084(d) cases assure against violation of the privilege. The plaintiff, to challenge the threatened discontinuation, must file a complaint in the federal or state court; but there is no requirement that the complaint make reference to any fact which would indicate that the plaintiff had transmitted or received gambling information in violation of federal, state, or local law. The complaint need only set forth the threatened termination of facilities and assert its right to telephone service. The defendant in this type of proceeding bears the burden of proof, and it must establish, by a preponderance of the evidence, that the service has been used in violation of the law. Fay v. Miller, 87 U.S.App.D.C. 168, 183 F.2d 986 (1950); Andrews v. Chesapeake & Potomac Tel. Co., 83 F.Supp. 966 (D. D.C.1949). In the proceeding at bar, the trial court placed this burden upon defendant and defendant-intervenor. Telephone News System, Inc. v. Illinois Bell Tel. Co., 210 F.Supp. 471 (N.D.Ill.1962). Consequently, plaintiff is at no point required to come forward with evidence, much less testimony, until defendant has

satisfied this burden. Even then, a plaintiff is not required to take the stand or otherwise incriminate himself.

■ Under these circumstances, no deprivation of the privilege against self-incrimination arises from the necessity for the plaintiff to file a complaint in order to protect its right to telephone service.

(b) With regard to the second contention, plaintiff maintains that section 1084 (d) imposes penal sanctions without permitting the affected subscriber the benefit of those constitutional procedures required to be followed for conviction of a crime. Plaintiff contends that section 1084(d) is a punitive provision, under which discontinuation of one's telephone service upon a determination by a law enforcement agency that he has violated a federal, state, or local criminal law is a penalty for such violation. Plaintiff asserts that, consequently, the statute deprives it of the procedural safeguards guaranteed one accused of a crime by the fifth and sixth amendments.

In urging that section 1084(d) violates the fifth and sixth amendments, plaintiff relies primarily on Kennedy v. Mendoza-Martinez, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963). In that case the United States Supreme Court invalidated a section of the Immigration and Nationality Act of 1952 and its predecessor section in the Nationality Act of 1940 on the ground that the legislation was punitive in character. The sections in question automatically divested an American of his citizenship for leaving or staying outside the country to avoid the draft. The Court stated its conclusions as follows:

"Independently of prosecution, forfeiture of citizenship attaches when the statutory set of facts develops. It is argued that the availability after the fact of administrative and judicial proceedings .* * * to contest the validity of the sanction meets the measure of due process. But the legislative history and judicial expression with respect to every congressional enactment relating to the provisions in question dating back to 1865 establish that forfeiture of citizenship is a penalty for the act of leaving or staying outside the country to avoid the draft. This being so, the Fifth and Sixth Amendments mandate that this punishment cannot be imposed without a prior criminal trial and all its incidents, including indictment, notice, confrontation, jury trial, assistance of counsel, and compulsory process for obtaining witnesses. If the sanction these sections impose is punishment, and it plainly is, the procedural safeguards required as incidents of a criminal prosecution are lacking. We need go no further." 372 U.S. at 167, 83 S.Ct. at 566, 567, 9 L.Ed.2d 644.

Plaintiff asserts that the sanction imposed here, like that involved in Mendoza-Martinez, is plainly punishment. Plaintiff, argues that because the statute, by its terms, conditions imposition of the sanction upon violation of a criminal law, and because the sanction itself—deprivation of property—is necessarily punitive, the statute is clearly penal in character.

■ That a sanction is conditioned upon the criminality of the behavior involved is not determinative of the question whether a provision is penal. Murphy v. United States, 272 U.S. 630, 632, 47 S.Ct. 218, 71 L.Ed. 446 (1926). Cf. De Veau v. Braisted, 363 U.S. 144, 160, 80 S.Ct. 1146, 4 L.Ed.2d 1109 (1960) (opinion of Frankfurter, J.) (regulation of crime on the waterfront through disqualification of ex-felons from holding union offices); Barsky v. Board of Regents, 347 U.S. 442, 74 S.Ct. 650, 98 L.Ed. 829 (1954) (regulation of medical profession by suspension of physicians convicted of any crime). See also United States v. Constantine, 296 U.S. 287, 56 S.Ct. 223, 80 L.Ed. 233 (1935), where the Court deemed it significant that imposition of a tax was conditioned upon criminal conduct, but held the tax to be punitive because, in addition, the tax was clearly excessive in relation to the rev-

enue purpose assigned. Where the purpose of the sanction is preventive (as here), rather than to provide additional punishment for criminal conduct, the sanction is not penal in character. Murphy v. United States, supra.

■ Neither is it determinative that the sanction involves the deprivation of property. For example, the forfeiture of property used in violation of federal criminal law is not a criminal sanction. See United States v. One Ford Coupé Automobile, 272 U.S. 321, 328, 47 S.Ct. 154, 71 L.Ed. 279 (1926); Dobbins' Distillery v. United States, 96 U.S. 395, 24 L.Ed. 637 (1878).

■ The governing inquiry on the issue of the civil or penal character of a provision is whether the legislative aim in providing the sanction was to punish the individual for engaging in the activity involved or to regulate the activity in question. Kennedy v. Mendoza-Martinez, supra; Flemming v. Nestor, 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960). Congressional intent in this matter is to be established by the "objective manifestations of congressional purpose" as revealed by the legislative history of the act, and "Absent conclusive evidence of congressional intent as to the penal nature of a statute, * * * [certain] factors must be considered in relation to the statute on its face." Kennedy v. Mendoza-Martinez, supra 372 U.S. at 169, 83 S.Ct. at 568, 9 L.Ed.2d 644. In describing these factors, the Court, in Mendoza-Martinez, stated as follows:

"Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of *scienter*, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it ap-

pears excessive in relation to the alternative purpose assigned are all relevant to the inquiry, and may often point in differing directions." 372 U.S. at 168–169, 83 S.Ct. at 567–568, 9 L.Ed.2d 644. (Footnotes omitted.)

A final guide in the inquiry into congressional purpose is the principle that "unmistakable evidence of punitive intent * * * is required before a Congressional enactment of this kind may be struck down." Flemming v. Nestor, supra 363 U.S. at 619, 80 S.Ct. at 1377, 4 L.Ed.2d 1435. In Flemming, the Court stated that,

"It is thus apparent that, though the governing criterion may be readily stated, each case has turned on its own highly particularized context. Where no persuasive showing of a purpose 'to reach the person, not the calling,' Cummings v. Missouri, supra, [4 Wall. 277, 18 L.Ed. 356] at 320, has been made, the Court has not hampered legislative regulation of activities within its sphere of concern, despite the often-severe effects such regulation has had on the persons subject to it." Id. 363 U.S. at 616, 80 S.Ct. at 1375, 4 L.Ed.2d 1435.

■ The first matter to be consulted, legislative history, in no way suggests that Congress meant for discontinuation of telephone service to be a penalty for the violation of a criminal law. To the contrary, we have already shown that the congressional aim in enacting this provision was to curtail professional gambling activities—particularly bookmaking—by depriving those engaged in such activities of the rapid wire communications facilities necessary to their operation. An additional purpose was to aid the states in their efforts to prevent the use of such facilities for the transmission of gambling information.

Section 1084(d), as originally reported to the Senate, effected its purpose by penalizing the use of or the leasing, furnishing, or maintaining of wire communication facilities with the intention.

that they be used for transmitting bets or wagers. However, subsection (a) of the statute was amended so as to prohibit only the use of such facilities by persons engaged in the business of betting or wagering "in the belief that the individual user, engaged in the business of betting or wagering, is the person at whom the proposed legislation should be directed." S.Rep. No. 588, 87th Cong. 1st Sess. p. 2 (1961). The act was also amended to add subsection (d), "which the committee believes will provide additional assistance to the States in preventing the transmission of gambling information." Ibid.

These expressions of legislative intent clearly establish that the statute was directed at the use of telephone service for professional gambling operations. Only the gambler-users are directly penalized under section 1084(a), and it is their activities, their use of the telephone, that section 1084(d) attempts to curtail. Subsection (d) supplements the effort made in subsection (a) to prevent the use of wire facilities for criminal purposes by persons engaged in betting or wagering, the persons "at whom the proposed legislation should be directed." Subsection (d) is a substitute for that portion of the originally proposed subsection (a) that penalized telephone companies for knowingly leasing, furnishing, or maintaining wire communication facilities for gambling purposes, and it is designed to avoid the use of the telephone for such purposes without penalizing the telephone company. Its object is the curtailment of the business of betting or wagering.

Plaintiff is not a person engaged in the business of betting or wagering. Telephone News System, Inc. v. Illinois Bell Tel. Co., D.C., supra 210 F.Supp. at 477. But plaintiff provides a service useful to persons engaged in the business of betting or wagering, and by restricting plaintiff's use of the telephone, the government restricts activities on which "modern bookmaking depends." Plaintiff sustains a loss by reason of the restrictions, but the person aimed at is the book-maker, not the plaintiff. Plaintiff's loss is incidental to the suppression of the business of betting and wagering that is the intent of the statute.

It thus appears that the purpose of section 1084(d) is not penal but regulatory. Its object is the suppression of gambling by elimination of rapid transmission of gambling information essential to modern bookmaking: Its focus is regulation of the use of the telephone for the transmission of gambling information. The loss sustained by plaintiff is a relevant incident to the regulation of activities which are the real object of the legislation. Accordingly, it cannot be said that the statute is penal in intent: "Where the source of legislative concern can be thought to be the activity * * * from which the individual is barred, the disqualification is not punishment even though it may bear harshly upon one affected." Flemming v. Nestor, supra 363 U.S. at 614, 80 S.Ct. at 1374, 4 L.Ed.2d 1435.

█ As the legislative history establishes the non-penal aim of subsection (d), it is unnecessary to make a detailed analysis of those factors to be considered absent such a clear intent. It is appropriate to note summarily, however, that the discontinuation of telephone service is not an "affirmative disability or restraint"; it is not historically regarded as punishment; it is not meant to promote retribution and deterrent, but to prevent the continued use of communications to facilitate professional gambling activities; it has an "alternative purpose" and does not appear to be excessive in relation to that purpose. Moreover, although the behavior to which it applies is already a crime, the purpose of the sanction is to prevent continued transmissions of information useful to bookmakers rather than to provide an additional penalty for the violation of law.

Finally, we are unable to discover any persuasive indication that Congress's aim in enacting subsection (d) was penal, much less that "unmistakable evidence of punitive intent" required to strike

down a congressional enactment on that ground.

In presenting its contentions regarding the alleged penal character of subsection (d), plaintiff has placed great emphasis upon the active role of the government in this case, which, in seeking permission to intervene in this action, asserted that it was the "real party in interest." We do not see how the government's participation in this proceeding, together with its role in advising the telephone company of its duty to withdraw service to the plaintiff, establishes the penal character of the provision or of this action.

It is helpful to consider the background of public utility law and practice against which this provision was enacted. Although the procedures authorized by subsection (d) may be new to the federal statute books, they are not new in the public utility field.

 It has long been held that the customer's right to service from a public utility is conditioned upon his lawful use of the service. See, e. g., Bryant v. Western Union Tel. Co., 17 F. 825 (D.Ky. 1883); Godwin v. Carolina Tel. & Tel. Co., 136 N.C. 258, 48 S.E. 636, 67 L.R.A. 251 (1904); Bachelder, supra at 179. The utility has a right to withdraw service to prevent illegal use of its facilities, McBride v. Western Union Tel. Co., 171 F.2d 1 (9th Cir., 1948), and some courts have spoken of a duty on the part of the utility to do so, see, e. g., Hamilton v. Western Union Tel. Co., 34 F.Supp. 928, 929 (N.D.Ohio 1940); Andrews v. Chesapeake & Potomac Tel. Co., 83 F.Supp. 966, 968 (D.D.C.1949).

The practice in a number of states has long been that the utility discontinues service upon notification by the police that the service is being illegally used, and the police then present their evidence, on behalf of the company, in the proceeding brought by the customer to restore service or prevent threatened discontinuance. Bachelder, supra at 180–81. Western Union, AT&T, and the Bell System companies all have tariff provisions that service will not be furnished if a law

enforcement agency advises that the service is being or will be used in violation of law, or if the company receives other evidence that the service is being or will be so used. Id. at 178–79. In McBride v. Western Union Telegraph Co., 171 F.2d 1 (9th Cir., 1948), it was held that the company, under such a tariff, could discontinue service, upon notification by a law enforcement officer of illegal use, and that the notifying officers need not supply the company with their evidence of illegal use before discontinuation would be justified. See, contra, Andrews v. Chesapeake & Potomac Tel. Co., 83 F.Supp. 966, 968–969 (D.D.C.1949) (dictum). And in People ex rel. Restmeyer v. New York Tel. Co., 173 App.Div. 132, 159 N.Y.S. 369 (1916), the court stated: "It is certainly not an unlawful or oppressive use of police power to interrupt telephone service by arrangement between the police and the telephone company in a case where the telephone is being used, as it was in this case, to carry on a criminal business." 159 N.Y.S. at 370. Accord, Fay v. Miller, supra.

As has already been noted, where the customer brings a proceeding to restrain discontinuation, the defendant has the burden of establishing illegal use by a preponderance of the evidence. This procedure has been upheld on the ground that the action is not a criminal proceeding to punish the customer for past acts, but is an attempt by the company to prevent future improper use (as indicated by past use) of its property. See, e. g., In re DiBenedetto, 83 N.Y.S.2d 920 (S. Ct.1948); People ex rel. Restmeyer v. New York Tel. Co., supra.

We have observed that Congress wrote subsection (d) into section 1084 in order to accomplish the aim of curtailing illegal use of wire communication facilities for the transmission and receiving of gambling information without penalizing the telephone and telegraph companies. Consequently, that the subsection provides for an active role by law enforcement agencies and a passive role by the utilities involved does not establish that the congressional intent was penal—to pro-

vide law enforcement agencies with a civil proceeding for the prosecution of a crime; rather, Congress had a non-penal reason for drafting subsection (d) as it did.

In the Mendoza-Martinez case the Court found conclusive evidence of a penal intent in the legislative history of the statute in question. Equally conclusive evidence of the penal character of section 1084(d) would have to be shown before plaintiff could prevail on this ground in the case at bar. "[O]nly the clearest proof could suffice to establish the unconstitutionality of a statute on such a ground." Flemming v. Nestor, 363 U.S. 603, 617, 80 S.Ct. 1367, 1376, 4 L.Ed.2d 1435 (1960). No such proof has been made in this proceeding.

(c) Plaintiff's third contention with regard to its argument that section 1084 (d) authorizes the prosecution of a crime under the guise of a civil remedy is that this provision provides for the trial of federal crimes in state courts and state crimes in federal courts. Plaintiff asserts that the provision can result in a "hodge-podge" of the jurisdictional aspects of the courts and inquires whether the state courts may not be empowered to impose the fine or imprisonment provided by section 1084(a) upon a determination in a subsection (d) proceeding that subsection (a) has been violated.

It suffices to say with respect to this contention that, plainly, section 1084 (d) does not authorize a state court to impose the penalties provided in subsection (a), nor does it authorize a federal court to impose the criminal penalties of state statutes; it does not result in criminal convictions; and thus it does not result in any unwarranted expansion of jurisdiction of either the state or the federal courts.

3. *Contention That § 1084(d) is Void Because of Elimination of Remedies*

Plaintiff contends that section 1084(d) is unconstitutional because it eliminates all remedies for the wrongful termination of telephone service. The statute provides that " * * * no dam-

ages, penalty or forfeiture, civil or criminal, shall be found against any common carrier for any act done in compliance with any notice received from a law enforcement agency." It is clear that this provision eliminates any previously existing right of action for wrongful termination of service made in compliance with a notice from a law enforcement agency under section 1084(d).

The statute further provides for "reasonable notice to the subscriber" prior to discontinuation of service, and it specifies that "Nothing in this section shall be deemed to prejudice the right of any person affected thereby to secure an appropriate determination, as otherwise provided by law, in a Federal court or in a State or local tribunal or agency, that such facility should not be discontinued or removed, or should be restored." Plaintiff asserts, with respect to this portion of the provision, that since it does not guarantee by its terms the issuance of a temporary restraining order, it permits wrongful termination of service, for which the subscriber's only recourse would be to obtain the renewal of service and for which the subscriber could not obtain damages.

Plaintiff's contentions are inapposite in the case at bar. Plaintiff received notice of the threatened termination of telephone service and promptly instituted a proceeding before this court. Judge Will issued a temporary restraining order to prevent the discontinuation of service until the Court should determine whether such discontinuation was warranted. Consequently plaintiff has not suffered any deprivation of service of which it can complain.

It is both elementary and fundamental that a federal court has no jurisdiction to declare an act of Congress void unless the case before it calls for the application of a statutory provision which conflicts with the Constitution. This rule, first expressed in Marbury v. Madison, 5 U.S. (1 Cranch) 137, 176, 2 L.Ed. 60 (1803) was applied in United States v. Raines, 362 U.S. 17, 80 S.Ct. 519, 4

L.Ed.2d 524 (1960), to reverse a district court determination that a provision of the Civil Rights Act of 1957, Title 42 U.S.C. § 1971, was unconstitutional. The district court had ruled that the provision in question allowed the United States to enjoin purely private actions designed to deprive a person of his voting rights. In the controversy before the court, however, the United States was proceeding against state government officials. The Supreme Court, in reversing the lower court's ruling, refused to consider whether the statute could be constitutionally applied to the conduct of private persons, stating as follows:

> "The very foundation of the power of the federal courts to declare Acts of Congress unconstitutional lies in the power and duty of those courts to decide cases and controversies properly before them. This was made patent in the first case here exercising that power—'the gravest and most delicate duty that this Court is called on to perform.' [Holmes, J., in Blodgett v. Holden, 275 U.S. 142, 148, 48 S.Ct. 105, 107, 72 L.Ed. 206] Marbury v. Madison, 1 Cranch 137, 177–180 [2 L.Ed. 60]. This Court, as is the case with all federal courts, 'has no jurisdiction to pronounce any statute, either of a State or of the United States, void, because irreconcilable with the Constitution, except as it is called upon to adjudge the legal right of litigants in actual controversies. In the exercise of that jurisdiction, it is bound by two rules, to which it has rigidly adhered, one, never to anticipate a question of constitutional law in advance of the necessity of deciding it; the other never to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.' Liverpool, New York & Philadelphia S.S. Co. v. Commissioners of Emigration, 113 U.S. 33, 39 [5 S.Ct. 352, 355, 28 L.Ed. 899]. Kindred to these rules is the rule that one to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional. [Citations omitted.] In Barrows v. Jackson, 346 U.S. 249 [73 S.Ct. 1031, 97 L.Ed. 1586], this Court developed various reasons for this rule. Very significant is the incontrovertible proposition that it 'would indeed be undesirable for this Court to consider every conceivable situation which might possibly arise in the application of complex and comprehensive legislation.' Id., [346 U.S.] at 256 [73 S.Ct. at page 1035, 97 L.Ed. 1586.] The delicate power of pronouncing an Act of Congress unconstitutional is not to be exercised with reference to hypothetical cases thus imagined." 362 U.S. at 20–22, 80 S.Ct. at 522–523, 4 L.Ed.2d 524.

■ In accordance with these rules, this court will not pass upon the constitutionality of the application of section 1084(d) to hypothetical situations that might arise if a subscriber's service were wrongfully terminated or if a subscriber's prayer for a temporary injunction were denied and the court subsequently determined that termination was unwarranted. Neither situation is presented in the case at bar.

Plaintiff opposes application of these rules, relying upon Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940); Lovell v. City of Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938); and Smith v. Cahoon, 283 U.S. 553, 51 S.Ct. 582, 75 L.Ed. 1264 (1931), to show that where a statute is void on its face, the court may pass upon its validity. These three cases, however, involved statutes requiring licenses, and the Court held in all three cases that since the defendants had been convicted and sentenced under the ordinances and statutes in question, they could challenge the validity of the provisions even though they had not sought and been refused

the licenses before engaging in the proscribed conduct.

Where "weighty countervailing policies" are present, the federal courts have sometimes made exceptions to the rule of avoiding a constitutional question unless squarely presented in the case at hand. United States v. Raines, supra 362 U.S. at 22–23, 80 S.Ct. at 523–524, 4 L.Ed.2d 524. We find no such countervailing policy here. As the Court stated in Raines, "This case is rather the most typical one for application of the rules we have discussed." Id. 362 U.S. at 24, 80 S.Ct. at 524, 4 L.Ed.2d 524. The case may never arise where service is discontinued prior to a court's determination of whether discontinuation is warranted, or where a court denies an application for a temporary injunction. To pass upon these situations would be to "anticipate a question of constitutional law in advance of the necessity of deciding it * * *." Liverpool, New York & Philadelphia S.S. Co. v. Commissioners of Emigration, 113 U.S. 33, 39, 5 S.Ct. 352, 355, 28 L.Ed. 899 (1885).

 Even assuming, arguendo, that the question were properly before this court, we are of the opinion that this provision is consistent with the requirement of due process of law. It is not unreasonable or arbitrary, as plaintiff contends, and it does not deprive the affected subscriber of all remedies to protect against wrongful termination of service.

That this provision is not unreasonable or arbitrary is shown by the purpose behind its enactment. As discussed above, Congress first drafted this provision so as to authorize prosecution of public utilities for the knowing furnishing of communications facilities for gambling purposes. Congress redrafted the provision in order to insure that the utilities would not be penalized for termination of service, providing instead for reasonable notice of termination to the subscriber and expressly reserving to the subscriber his equitable remedy to prevent wrongful discontinuation. Compare

the statute held unconstitutional in Tollin v. Diamond State Tel. Co., 164 A.2d 254 (Del.Ct. of Ch.1960). See also Pike v. Southern Bell Tel. & Tel. Co., 263 Ala. 59, 81 So.2d 254 (1955), where many of the state court decisions are reviewed in the majority and dissenting opinions.

The result of this provision is to eliminate the discretion of the utility in the effectuation of the provision. Because of the principle of sovereign immunity, the subscriber cannot obtain damages or other penalties from the government for improper action. But persons are frequently confronted by the limitations of sovereign immunity in their dealings with the government. Congress is empowered to regulate the area of interstate and foreign communications, and we consider that it can effect this regulation by placing responsibility for preventing the unlawful use of communication facilities upon law enforcement agencies instead of upon the utilities, which are less well equipped to investigate and discover the illegal use of such facilities. It seems reasonable to protect the utilities from damage actions under these circumstances.

Plaintiff contends that under Brinkerhoff-Faris Trust & Savings Co. v. Hill, 281 U.S. 673, 50 S.Ct. 451, 74 L.Ed. 1107 (1930), the deprivation of remedies provided in section 1084(d) is unconstitutional. In Hill, the plaintiff brought suit to enjoin the collection of property taxes, alleging that the assessment violated the equal protection clause of the constitution. In previous cases, the state courts had ruled that no administrative remedy was available and that injunctive relief was appropriate for the determination of the validity of such a claim. The state supreme court overruled the earlier cases, and it denied relief because the plaintiff had failed to seek its administrative remedy. The United States Supreme Court reversed, stating that "a State may not deprive a person of all existing remedies for the enforcement of a right, which the State has no power to destroy,

636

unless there is, or was, afforded to him some real opportunity to protect it." 281 U.S. at 682, 50 S.Ct. at 454–455, 74 L. Ed. 1107.

It is apparent that the Hill case does not support the position taken by plaintiff in the case at bar. It is true that a telephone subscriber might be wrongfully deprived of telephone services under the statute either where he failed to bring an appropriate action to prevent termination of service or where such an action did not result in the entry of a temporary restraining order; however, if the telephone subscriber chooses to act promptly, actual termination of the service can be avoided prior to an adjudication on the merits. Reasonable notice of termination must be given by the telephone company under section 1084 (d), and during the notice period proceedings may be initiated to prevent termination in a federal or state court or in a local tribunal or agency. The doors of the courts are expressly opened for timely judicial intervention under the statute. Thus section 1084(d) does not deny the telephone subscriber a "real opportunity to protect" his rights. An adjudication on the merits will be had prior to termination, except in the rare case of error on the part of the court or tribunal in denying a temporary restraining order. We think that due process requires nothing more. In Ewing v. Mytinger & Casselberry, Inc., 339 U.S. 594, 599, 70 S.Ct. 870, 94 L.Ed. 1088 (1950), the Supreme Court held that a hearing prior to the seizure of misbranded drugs was not a requirement of due process, even though irreparable damage to a business might result from such a seizure. It is doubtful that irreparable damage would ever occur as a result of section 1084(d), as few damage actions are ever brought for wrongful termination of telephone service, "probably because the facilities for halting the discontinuation of service are so adequate that damages never accrue in sufficient quantity." Bachelder, supra at 181 n. 25.

## II. CONSTITUTIONALITY OF § 28–1(a) (10) OF THE ILLINOIS CRIMINAL CODE

Plaintiff asserts that section 28–1(a) (10) of the Illinois Criminal Code is unconstitutional. Plaintiff contends that its telephone service cannot be discontinued under title 18 U.S.C. § 1084(d) where the state statute found to have been violated is void.

### 1. Contentions That the Court Should Avoid the Constitutional Question

(a) Defendant Illinois Bell Telephone Company urges that this court abstain from deciding the question of the constitutionality of section 28–1(a) (10). Under the doctrine of abstention, federal courts have frequently declined to exercise their jurisdiction in cases involving uncertain state laws when the resolution of a state issue might obviate the necessity for adjudication of a federal constitutional question. Note, Judicial Abstention From the Exercise of Federal Jurisdiction, 59 Colum.L.Rev. 749 (1959); Note, Consequences of Abstention by a Federal Court, 73 Harv.L.Rev. 1358 (1960). The procedure usually followed in the exercise of abstention is for the federal court to retain jurisdiction pending the determination of a state declaratory action, or other appropriate proceeding. See e. g., United Gas Pipe Line Co. v. Ideal Cement Co., 369 U.S. 134, 82 S.Ct. 676, 7 L.Ed.2d 623 (1962).

Abstention is often deemed appropriate where, as here, there is a possibility that the state supreme court would construe a state statute in such a way as to avoid federal constitutional objections. See, e. g., Harrison v. Nat'l Ass'n for the Advancement of Colored People, 360 U.S. 167, 177, 79 S.Ct. 1025, 3 L. Ed.2d 1152 (1959). Thus, defendant Illinois Bell Telephone Company urges that this Court should abstain from considering plaintiff's challenge of the validity of section 28–1(a) (10) in view of the possibility that the Illinois Supreme Court might so construe this provision as to eliminate all constitutional doubts.

Recognizing that the United States Supreme Court has given increasing scope to the doctrine of abstention (see Notes, supra), we nevertheless consider that abstention would be inappropriate in the case at bar. Three considerations prompt this conclusion.

■■■ The first is the manner in which the state statute is involved in this proceeding. Section 28–1(a) (10) has been incorporated by reference into a federal statute. Of course, the Illinois Supreme Court's construction of this provision would be binding upon this court if such a construction had been made. But to delay this proceeding to await a state court interpretation would delay the operation of a federal statute. Such a delay, we consider, should be avoided, unless plainly required.

■■■ The second consideration is that a state court construction of the provision in question would be unlikely to shed light upon the issue at hand. Where there is slight chance that the result in the state court would be different from that in the federal court, abstention, with the substantial delay and expense resulting therefrom, is not required. City of Chicago v. Atchison, T. & S. F. Ry., 357 U.S. 77, 78 S.Ct. 1063, 2 L.Ed.2d 1174 (1958); All American Airways v. Village of Cedarhurst, 201 F.2d 273 (2d Cir., 1953). The Court stated in County of Allegheny v. Frank Mashuda Co., 360 U.S. 185, 188–189, 79 S.Ct. 1060, 1062–1063, 3 L.Ed.2d 1163 (1959), that

"The doctrine of abstention * * is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it. Abdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest."

■■■ Under these principles, we consider that the operation of a federal statute should not be delayed to permit a construction of state law by the state courts where it is doubtful that a state determination would differ from that of this Court. We agree with Judge Will's interpretation of the section at issue made in Kelly v. Illinois Bell Tel. Co., 210 F.Supp. 456 (N.D.Ill.1962), the companion case to this one, and in his opinion entered in this case, Telephone News Service, Inc. v. Illinois Bell Tel. Co., supra. That interpretation, in which the provision was limited to avoid constitutional difficulties, was dictated by the legislative history of the statute and by the principle that a statute should be so construed as to uphold its validity. It is appropriate to assume that the Illinois courts will judge the statute in light of these same dictates. It is the policy of the Illinois courts to construe a statute so as to uphold its validity. See, e. g., Chicago v. Willett Co., 406 Ill. 286, 94 N.E. 2d 195 (1950), vacated, 341 U.S. 913, 71 S.Ct. 734, 95 L.Ed. 1349, clarified, 409 Ill. 480, 101 N.E.2d 205 (1951), reversed on other grounds, 344 U.S. 574, 73 S. Ct. 460, 97 L.Ed. 559 (1953). We thus conclude that there is no reasonable likelihood that a prior state court construction of section 28–1(a) (10) would alter the complexion of the issue before this Court.

The third consideration is that this Court does not rule that the Illinois statute is unconstitutional; rather, we are upholding its validity. No precedent has come to our attention in which a federal court has refused abstention and has limited a state statute to uphold its validity, where the state court has not yet construed the provision. But neither has any precedent come to our attention requiring abstention under these circumstances. The cases hold that a federal court may not rule *invalid* a state statute which the state courts have not yet interpreted, where it is possible that the state court will so construe the provision as to obviate constitutional objections. See, e. g., Harrison v. Nat'l Ass'n for the Advancement of Colored People, 360 U.S.

167, 79 S.Ct. 1025, 3 L.Ed.2d 1152 (1959). Consequently, while we should abstain from holding section 28-1(a) (10) invalid to await state judicial construction, we do not regard it as appropriate to abstain from holding it *valid* to await a construction which would, in all likelihood, be the same as ours.

(b) The government urged, in oral argument, that we avoid determination of plaintiff's contention that the Illinois provision is unconstitutional on a different ground. The government asserts that this Court need not consider that argument if we rule that plaintiff's telephone service may be discontinued under subsection (d) because the information transmitted by plaintiff has been used by professional bookmakers in their operations, in violation of subsection (a).

Judge Will has already determined that plaintiff has not violated subsection (a), because plaintiff is not "engaged in the business of betting or wagering". Telephone News System, Inc. v. Illinois Bell Tel. Co., 210 F.Supp. 471, 477 (N.D.Ill.1962). The government asserts, however, that since the evidence established that one Retelle, a professional gambler and bookmaker in Lansing, Michigan, used plaintiff's telephone service, a violation of subsection (a) by Retelle has been established, and that plaintiff's telephone facilities should therefore be discontinued under subsection (d) because they have been used by Retelle to receive gambling information in violation of federal law.

In support of this position, the government urges that the term "transmission" as used in subsection (a) does not mean "sending," but rather means sending or receiving. Therefore, it maintains, Retelle violated subsection (a) when he received information from plaintiff over the telephone.

We must reject the theory that "transmission" as used in subsection (a) means sending or receiving. Whatever validity there might be to the argument that "transmission," in some contexts, has a

meaning broader than the term "sending," it is plain that Congress meant it as "sending" in this statute. Subsection (d) uses the term "transmitting or receiving," and it is illogical to suppose that Congress would not have used both terms in both subsections had it meant to include "receiving" in subsection (a). We shall not assume that "transmission" has one meaning in subsection (a) and another in subsection (d), nor that "receiving" in subsection (d) is superfluous.

2. *Contention that § 28-1(a) (10) Is an Unreasonable Exercise of the Police Power*

Plaintiff contends that section 28-1(a) (10) of the Illinois Criminal Code is an unreasonable exercise of the police power of the state, because it is not reasonably designed to remedy the evils toward which the statute is directed, that is, the suppression of gambling. Plaintiff first asserts that this section, by its terms, forbids the transmission of the prohibited information before, during, and after a sporting event or contest, and that the prohibition of such transmission, no matter how long after the event, is patently unreasonable. Plaintiff further asserts that if it has violated this section, United Press International News Service, plaintiff's sole source of the information which it disseminates, likewise has violated this provision. Since there is no exemption in the Illinois statute for such a news service, plaintiff argues, the statute violates the first amendment to the United States Constitution.

In advancing its first argument, plaintiff relies upon Parkes v. Bartlett, 236 Mich. 460, 210 N.W. 492, 47 A.L.R. 1128 (1926). In that case, the Michigan Supreme Court held that a state statute making unlawful the transmission of information concerning wagers was unconstitutional insofar as it related to the transmission of information after the event. The court held that the statute prohibited all publications of betting odds after the event, no matter how long thereafter, and that consequently the

provision was not reasonably related to the suppression of gambling, but prohibited the harmful and the harmless alike.

■ Parkes v. Bartlett is distinguishable from the case at bar. In Kelly v. Illinois Bell Tel. Co., supra, 210 F. Supp. at 464–465, section 28–1(a) (10) was reasonably interpreted to apply only to the rapid transmission of the proscribed information. See also Telephone News System, Inc. v. Illinois Bell Tel. Co., supra 210 F.Supp. at 475–477. The court based its interpretation upon the following statement of the Joint Committee which drafted the revised Illinois Criminal Code:

> "Subsection (a) (10) makes it an offense to knowingly transmit betting information over the telephone or other means of rapid communication. This is designed to reach middlemen, agents and other participants in the gambling racket who might not technically qualify as offenders under other subsections of the article. It also reaches into the heart of syndicate activity by outlawing the operation of telephone networks necessary to furnish betting information." Tentative Final Draft of the Proposed Illinois Criminal Code of 1961, Committee Comments at 307–08.

That the statute singles out "means of rapid communication" plainly indicates that it was the rapid transmission of information, shortly after the event, that was the object of the legislation. The prohibition of transmission of information as to wagers, betting odds, or changes in betting odds soon after the event is clearly related to the suppression of illegal gambling, for "modern bookmaking depends in large measure on the rapid transmission of gambling information * * *." H.R.Rep. No. 967, 87th Cong., 1st Sess. (1961). See also State v. Ucciferri, 61 So.2d 374 (Fla.1952). This Court has found that plaintiff's transmissions are fast or rapid within the prohibition of this section. Telephone News System, Inc. v. Illinois Bell Tel. Co., supra 210 F.Supp. at 476. Consequently, plaintiff is in no position to complain of any hypothetical violation of the statute by the transmission of information long after an event. Cf., United States v. Raines, 362 U.S. 17, 80 S.Ct. 519, 4 L. Ed.2d 524 (1960).

■ In advancing its second argument, plaintiff asserts that unless such a news service as UPI is exempt from the operation of the Illinois statute, the provision violates the first amendment, citing Kelly v. Illinois Bell Tel. Co., supra 210 F.Supp. at 465. In the Kelly opinion, Judge Will held that transmissions by telephone or telegraph to publishers of newspapers and other printed publications did not violate the provision. The Court held that the statute "is obviously directed at the rapid transmission of either actual wagers, betting odds or changes in betting odds *to or by persons directly or indirectly engaged in gambling operations*." 210 F.Supp. at 465. (Emphasis supplied.) The court logically reasoned that since the section in question is a definition of "gambling" the legislature meant to limit the provision "to persons having some direct or indirect relation to gambling activities." Ibid. The court further reasoned that this limitation was required in order to avoid a conflict with the first amendment of the federal constitution. In the case at bar, this Court has found that the telephone information service furnished by plaintiff was used by a professional bookmaker, and that indeed "there is no evidence in the record * * * to indicate any legal use of plaintiff's information service." 210 F.Supp. at 476. It is thus clear that plaintiff transmits the information prohibited by this section to "persons directly or indirectly engaged in gambling operations."

Inasmuch as the application of this provision to the plaintiff is constitutional, having a reasonable relation to the suppression of gambling, we need not decide whether the provision was meant to apply to the furnishing of a sports

printer by the UPI to plaintiff. Again, we need not determine the scope and constitutionality of the application of this provision to every conceivable situation that might arise. United States v. Raines, supra.

Section 28–1(a) (10), as interpreted in Kelly, is limited to the rapid transmission of information by or to persons related to gambling activities. It is therefore a reasonable exercise of the police power, reasonably related to the suppression of gambling. Cf. State v. Ucciferri, 61 So.2d 374 (Fla.1952).

Accordingly, we conclude that neither section 1084(d) of Title 18 U.S.C., nor section 28–1(a) (10) of the Illinois Criminal Code as applied in the case at bar, violates the provisions of the United States Constitution. A judgment order dismissing the plaintiff's complaint with costs to be assessed against the plaintiff will be entered in keeping with the views expressed in this memorandum of decision which together with the memorandum of decision reported at 210 F. Supp. 471, shall stand as the Court's findings of fact and conclusions of law within the meaning of Rule 52 of the Federal Rules of Civil Procedure.

WILL, District Judge (concurring).

This is, for me, an exceedingly troublesome case. The conclusions of Judge HOFFMAN'S scholarly opinion are inescapable in the light of the prior decisions discussed therein. Moreover, as I found in my earlier opinion—Telephone News System, Inc. v. Illinois Bell Telephone Co., 210 F.Supp. 471, 476 (N.D.Ill.1962) —there is nothing in the record of this case indicating any lawful use of plaintiff's facilities. I am satisfied that plaintiff's facilities are, in fact, used almost entirely by people engaged in illegal off-track gambling on horse races and that their elimination will serve a useful public purpose. Notwithstanding, I am disturbed.

What concerns me is that, while any action under Title 18 U.S.C. § 1084(d) is necessarily predicated on a violation of federal, state or local criminal law by the utility user, the proceedings permitted under the statute, because allegedly civil in nature, are far short of what would constitute due process and the sanctions, on the other hand, far more serious than were criminal action taken directly under the same federal, state or local laws against the same utility user.

The instant case illustrates clearly the circumvention of traditional constitutional guarantees by the civil versus criminal semantics which the earlier decisions have developed and which Judge HOFFMAN has quite accurately applied in his opinion.

Here, an Assistant Attorney General of the United States wrote a short letter, dated April 25, 1962, to Illinois Bell Telephone Co. advising it that the Department of Justice had reason to believe that plaintiff's telephone facilities "are being and will be used for the transmission and receiving of gambling information in interstate commerce in violation of Federal law * * *." The letter notified the telephone company that it was required under Section 1084(d) to discontinue leasing telephone facilities to plaintiff and suggested that five days notice be given of the impending termination.

Thereafter, on April 27, 1962, the telephone company wrote an even more cryptic letter to the plaintiff as follows:

"Telephone News System, Incorporated
"81 West Van Buren Street
"Chicago, Illinois

"Gentlemen:

"We have received a letter from the United States Department of Justice, acting under Title 18 of the U. S. Code, Section 1084(d), requiring us to discontinue service on the telephone facilities furnished to you at 81 West Van Buren Street, Chicago, Illinois, after reasonable notice to you.

"It is our present intention to comply with this letter at 9 A.M., C.D.T., on May 5, 1962."

Plaintiff was then faced with the alternatives of doing nothing and thus being put out of business or seeking an injunction. It, of course, chose the latter and this action was commenced.

It will be noted that the foregoing two letters were in lieu of the investigation, presentment to a grand jury of evidence of a law violation, and the return of an indictment alleging specific acts violative of a clearly identified statute or statutes which would be required to institute a criminal case. Yet the charge is, as the Assistant Attorney General's letter to the telephone company indicates, that plaintiff is violating federal law, a charge incidentally which was not disclosed to plaintiff until after it commenced this suit.

So much for the pre-court phase of the matter. The second stage is equally sui generis. While the asserted law violator is nominally the plaintiff, the earlier cases hold, and I so held in my prior opinion, that the burden of proof is on the defendant. While the telephone company is nominally the defendant, the real party in interest, as it contended in its petition for leave to intervene, is the United States and so it, the intervenor, had the burden of proving that plaintiff's telephone facilities were being used in violation of federal, state or local law and it did present the only evidence in the case. That evidence, incidentally, consisted primarily of the deposition of a professional gambler who admitted calling plaintiff's telephone number in connection with his activities. The deposition was taken after the commencement of plaintiff's action so the record gives no indication upon what evidence, if any, the government's original letter to the telephone company was based.

The standard of proof, however, since this is nominally a civil action, a suit for an injunction, has been held in the earlier cases to be merely "a preponderance of the evidence" rather than "beyond a reasonable doubt." There is, of course, no presumption of innocence, no right to a jury trial, no right of confrontation or any of the other criminal trial safeguards.

At the trial in the instant case, the government urged that the plaintiff had violated one or all of several federal and Illinois statutes. I found, a finding in which my brothers concur, that it had established by a preponderance of the evidence only that plaintiff had violated one of the statutes in question, Section 28–1(a) (10) of the Illinois Criminal Code of 1961. It may be noted, in this connection, that the Department of Justice in its letter to the telephone company referred only to violations of federal law, and therefore the charge in the original letter from the Department of Justice to the telephone company stands unproved. I assume this to be immaterial, however, since Section 1084(d) makes violation of federal, state or local law a basis for termination of the utility service, and since, in any event, no indication of any grounds for termination were given, or apparently were required to be given, to plaintiff.

Probably the greatest incongruity in the civil versus criminal character of this case is the ultimate judgment. If the plaintiff had been convicted in an Illinois court of violating Section 28–1 (a) (10) of the Illinois Criminal Code of 1961, the maximum penalty which could have been imposed, since it is a corporation, would have been a fine of $500 for the first offense and $1,000 for each subsequent offense. However, under 1084 (d) and the civil-injunction proceedings which plaintiff was forced to institute, the ultimate judgment can be the death penalty for it is agreed by all concerned that termination of plaintiff's telephone facilities means, as it would to most businesses, its demise. Yet, as Judge HOFFMAN'S opinion points out, the earlier decisions on the subject of forfeitures sanction such a result.

To summarize, Title 18 United States Code § 1084(d), as applied in the instant case, results in a federal court authorizing plaintiff's demise at the conclusion of a civil action, which judgment

is based on a finding that the intervenor-defendant, the United States, has proved by a preponderance of the evidence that the plaintiff violated a criminal statute of the State of Illinois.

This to me incongruous procedure and result is the logical extension of a line of decisions which seems to me to warrant re-examination. These are the decisions holding that a forfeiture is not a penalty and, accordingly, that proceedings involving forfeitures are civil, not criminal, in nature. The earliest important decision on this question is Dobbins' Distillery v. United States, 96 U.S. 395, 24 L.Ed. 637 (1877), in which the distillery was seized and forfeited on the grounds that the lessee "made false entries in the books kept in the distillery, and * * * he omitted to enter in the same the facts required by law, with intent to defraud * * *." Id. 96 U.S. at 396, 24 L.Ed. 637. The defendant, which was the owner of the property and not the lessee thereof, urged that it had no knowledge of the acts charged and that a criminal, not a civil, trial should have been required. In upholding the forfeiture, the Court said:

> "Cases arise, undoubtedly, where the judgment of forfeiture necessarily carries with it, and as part of the sentence, a conviction and judgment against the person for the crime committed; and in that state of the pleadings it is clear that the proceeding is one of a criminal character: but where the information, as in this case, does not involve the personal conviction of the wrong-doer for the offence charged, the remedy of forfeiture claimed is plainly one of a civil nature; as the conviction of the wrong-doer must be obtained, if at all, in another and wholly independent proceeding * * *
>
> "Forfeitures, in many cases of felony, did not attach at common law where the proceeding was *in rem* until the offender was convicted, as the crown, Judge Story says, had no

right to the goods and chattels of the felon, without producing the record of his conviction; but that rule, as the same learned magistrate says, was never applied to seizures and forfeitures created by statute *in rem*, cognizable on the revenue side of the exchequer court, for the reason that the thing in such a case is primarily considered as the offender, or rather that the offence is attached primarily to the thing, whether the offence be *malum prohibitum* or *malum in se * * *.*" Id. 96 U.S. at 399–400, 24 L.Ed. 637.

Subsequent decisions, including United States v. Zucker, 161 U.S. 475, 16 S.Ct. 641, 40 L.Ed. 777 (1896); Various Items of Personal Property v. United States, 282 U.S. 577, 51 S.Ct. 282, 75 L.Ed. 558 (1931); and Helvering v. Mitchell, 303 U.S. 391, 58 S.Ct. 630, 82 L.Ed. 917 (1938), broadened the types of property which might be seized and forfeited without constituting a penalty or punishment and which seizures therefore were beyond the requirements and protection of due process.

Interestingly, a related line of cases has developed simultaneously holding that, if the person whose alleged violation of some criminal law is the basis for the forfeiture has previously been tried and acquitted, no civil seizure of the property may be made. Coffey v. United States, 116 U.S. 436, 6 S.Ct. 437, 29 L.Ed. 684 (1886) and Inman v. United States, 151 F.Supp. 784 (W.D.S.C.1957). As the decisions now stand, a forfeiture prior to criminal prosecution and establishment of guilt constitutes due process, but after prosecution and acquittal it does not.

The case apparently has not yet arisen in which the acquittal in the criminal proceedings follows the forfeiture. It undoubtedly will and, unless the basic concept changes, some court will be faced with the necessity of reconciling the irreconcilable.

The distinction between civil or criminal proceedings for the violation of a

criminal law based as it now is on the distinction between punishment and penalty or so-called preventive regulation seems to me to be particularly incongruous where, as here, the maximum penalty, a fine of $500, which might have been imposed in a criminal proceeding with all the constitutional safeguards respected, is infinitely less than the sanction of being put out of business or having property forfeited, these being the result of the civil action devoid of constitutional safeguards. Yet the basis for both proceedings is precisely the same, the violation of the state criminal law.

In this connection, it should be noted that the recent Supreme Court decision of Kennedy v. Mendoza-Martinez, 372 U. S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963), discussed in Judge HOFFMAN'S opinion, held invalid as punitive a section of the Immigration and Nationality Act of 1952 which automatically divested an American of his citizenship without the necessity of any prior criminal trial if he left or stayed outside the country to avoid the draft. The Court concluded that forfeiture of citizenship was clearly punishment. It seems to me that where the forfeiture of property will be fatal to the business life of the party involved and substantially greater and more severe than the maximum punishment which could have been imposed in a direct criminal proceeding, labelling it preventive and non-penal is a sophistry which hardly warrants the abrogation of the Constitutional protections which are the keystones of American criminal justice.

While not, of course, determinative, it should be noted that Congress saw fit to title sec. 1084, of which the subsection before us is a part, with the designation "Penalties".

Although we are here called upon to pass only on the application of sec. 1084 (d) to the facts of the instant case, it is appropriate, at least in passing, to reflect upon the implications and possible application of the procedure to other situations, for it represents, I believe, a new technique in criminal law enforcement.

If the withdrawal of a vital utility service may be accomplished constitutionally by the simple mechanics contemplated by sec. 1084(d) where the facility is allegedly being used to violate federal, state or local criminal laws relating to gambling, it presumaby will be equally valid for eliminating alleged violations of other federal, state and local criminal laws, such as federal and state anti-trust laws, those regulating the sale and distribution of securities, the possession and sale of narcotics, income, sales and other tax laws and so on.

In our inter-dependent economy, where rapid communication is vital to virtually every commercial enterprise, the withdrawal of telephone facilities on the ground that some federal, state or local law enforcement officer has reason to believe that they are being used in violation of a federal, state or local law, may prevent some law violations. But it will also eliminate all of the basic safeguards which we have so carefully developed to protect the accused even though he be ultimately found guilty.

And, of course, the technique need not be limited to telephone facilities, since the withdrawal of other utility services would presumably be equally proper.

Illegal gambling and the interstate rapid transmission of information which makes it possible are rightly matters of serious public concern as are violations of all criminal laws. Our law enforcement officials are entitled to all possible assistance consistent with those safeguards of due process which we deem indispensable to the protection of the individual citizen.

Substituting so-called preventive forfeitures of property for penal sanctions of fines or sentences of incarceration and thereby converting criminal into civil proceedings does not seem to me to be the proper answer to our law enforcement problems.

In the light of the decisions so carefully analyzed and applied in Judge HOFFMAN'S opinion, I concur in the judgment of the Court.