Tommy TRUCHINSKI, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 18798.

United States Court of Appeals
Eighth Circuit.

April 29, 1968.

Keith D. Kennedy, St. Louis Park, Minn., for appellant.

Neil P. Convery, Asst. U. S. Atty., Minneapolis, Minn., for appellee; Patrick J. Foley, U. S. Atty., on the brief.

Before MATTHES, GIBSON and HEANEY, Circuit Judges.

FLOYD R. GIBSON, Circuit Judge.

This is an appeal from the United States District Court for the District of Minnesota. Tommy Truchinski was found guilty on November 4, 1967, by a jury on two counts of an indictment charging him with violation of 18 U.S.C. § 1084(a),[1] using the telephone between New Britain, Connecticut and Minneapolis, Minnesota to transmit information assisting in the placing of bets on sporting events. A third count against Truchinski, use of the mail to distribute the proceeds of and otherwise promote and carry on an unlawful activity in violation of 18 U.S.C. § 1952, was dismissed by the Court at the close of the Government's case. Truchinski was given a general sentence of two years probation and a $1,000 fine on both counts of conviction.

On appeal, Truchinski urges that (1) the evidence was insufficient to support the jury's verdict and is contrary to law; (2) the District Court erred in denying his motion that the Court examine the minutes of the grand jury; and (3) that 18 U.S.C. § 1084(a) is an unconstitutional abridgement of freedom of speech. We affirm the judgment of the District Court.

The Government's evidence consisted primarily of the uncontroverted testimony of Joseph M. Baffetta who appeared under subpoena. Baffetta, a resident of Minneapolis, had known Truchinski for 16 or 17 years. Truchinski resided in New Britain, Connecticut for the last two or three years where he apparently was employed as a laborer at the Stanley Tool Works. Baffetta testified that he bet regularly with Truchinski, making about 50 to 70 bets with him in 1965 with the usual amount wagered being between $25 and $50. The commonly used procedure was for Truchinski to call Baffetta and give him the "line" or "point spread" (odds or handicap information) on games that Baffetta indicated he was interested in betting on. On two or three occasions, Baffetta called

1. 18 U.S.C. § 1084(a) reads:

"Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information as- sisting in the placing of bets or wagers on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers,

Truchinski at a phone number furnished him by Truchinski and reached an establishment in New Britain, Connecticut called the Liberty Variety Smoke Shop. Truchinski was a frequenter but not an owner or employeé of the Smoke Shop contacted. Andy Mascola, proprietor of the Smoke Shop, testified that he saw Truchinski in the Shop several times a week in 1965, and had on occasion seen him use the pay phone there.

Baffetta testified that a running account was kept with Truchinski. Depending on whether Baffeta won or lost on a particular wager, the figure "would go up or down, even, minus or plus, even, and so forth like that." The account was squared periodically, Baffetta sending Truchinski money once, with Truchinski, in at least two instances, sending him the balance he had coming by registered mail. The Government introduced registered receipts for letters sent from Truchinski to Baffetta's residence, dated December 21, 1965 and January 25, 1966, · which letters Baffetta received and acknowledged that they contained money representing amounts due him from Truchinski.

Baffetta testified he was not certain whether Truchinski "kept the bet" or passed it on to someone else; Truchinski told Baffetta that "he got rid of it." If Baffetta wanted a bet at particular odds, Truchinski would take the bet and "shop around and try to get it,.for me, just like a stockbroker shops around for different stocks and tries to get the right price." Sometimes, Truchinski would have to find out if a particular bet could be placed, and "If I don't call you back, that means you have it."

Count 1 concerns a phone conversation initiated by Baffetta from a pay phone located at the Minneapolis Brewery on the evening of October 15, 1965, to the Smoke Shop where Truchinski was contacted. Baffetta inquired about the weather out there and asked about the point spread on a couple of football games; Truchinski responded that the weather was inclement and gave the point spread on some games. No bets were placed at that time. The next day Truchinski called Baffetta at his residence in Minneapolis and after an inquiry about the weather, Baffeta placed a couple of bets on football games, one for $25 and one for $40.

Count 2 concerns a phone conversation initiated by Truchinski on March 12, 1966, when he called Baffetta at Andy's Bar on the east side of Minneapolis. Baffetta testified as follows:

"Q. What did he say when he called you on March 12, 1966?

"A. He said, 'How is everything?' I said 'So-so.' He said there wasn't much doing that day, only two games going that day, he said.

"Q. What did you say to him?

"A. I said, 'Don't look like there's much going.' So one game happened to be on TV. I said, 'I don't particularly care much for anything to do. Just to have something to do I will make a two-team parlay.'

"Q. How much did you bet?

"A. Not much, twenty or thirty, it was $20 or $30. I think it was $30.

"Q. What did he say when you told him the amount of money?

"A. He said, 'Okay.' That was all there was to it.

"Q. Can you tell us what team you bet on?

"A. One was on TV, I think it was Penn State and St. John's."

Government witnesses were called to verify Baffetta's testimony concerning the placing of the calls. Employees of the Northwestern Bell Telephone Company and the Southern New England Telephone Company produced business records showing that a long distance call was placed on October 15, 1965 at 6:55 p. m. from a pay phone at the Minneapolis Brewing Company to a pay phone located in the Liberty Variety Smoke Shop. Mascola acknowledged he had

or for information assisting in the placing of bets or wagers, shall be fined not more than $10,000 or imprisoned not more than two years, or both."

seen Truchinski in the Smoke Shop, and had seen him use the pay phone there. A Government Agent established the presence of Truchinski in New Britain on March 12, 1966.

■ The Government and Truchinski are agreed that two elements must be present in the case at bar for a violation of § 1084(a)—that the information transmitted on the telephone assisted in the placing of bets or wagers, and that the defendant during this time must have been engaged in the business of wagering or betting. Truchinski did not testify or present any witnesses but strongly protests that the evidence fails to show either element. He seeks to characterize his relationship with Baffetta as that of old friends merely exchanging information about various sporting events and the weather, etc., with Baffetta at times exercising his independent judgment to bet on sporting events with him. Truchinski stresses that at no time was Baffetta asked at trial whether the telephone conversations were of assistance to him in placing bets or wagers. Truchinski notes that his occupation was shown to be that of a laborer, and not that of a "bookie," and one who, at most, acted as an agent for and in behalf of Baffetta in the placing of Baffetta's bets.

The contention that the Government failed to prove that Truchinski was engaged in the business of betting or wagering is refuted by substantial evidence. From the evidence presented a jury could properly conclude that the relationship between Truchinski and Baffetta was considerably more than that of two friends merely exchanging their mutual views about sporting events with an occasional friendly wager. In Cohen v. United States, 378 F.2d 751, 757 (9 Cir. 1967), cert. denied 389 U.S. 897, 88 S.Ct. 217, 19 L.Ed.2d 215, the Court noted that "Wagers otherwise within the statute are not excluded because contracted with friends." Baffetta's dealings with Truchinski show a course of conduct that the jury could certainly infer was characteristic of an efficiently operated wagering business. From 50 to 70 bets, totaling between $1000 and $1750, were placed by Baffetta with Truchinski for the most part in response to calls placed by Truchinski.[2] Baffetta was given a phone number where he could contact Truchinski, and the running account between the pair was settled periodically by registered mail. This uncontroverted evidence is relevant and persuasive that Truchinski was engaged in the business of betting or wagering. Cohen, supra, pp. 758–759 of 378 F.2d.

■ While Baffetta stated he thought that Truchinski was employed as a factory worker, and that Truchinski "passed on" the bets made, there is no requirement under § 1084(a) that the offender be exclusively engaged in the business of betting or wagering. The fact that Truchinski might properly be characterized as an agent acting for someone else is likewise no defense. As noted in Cohen, supra, at p. 758 of 378 F.2d:

"* * * the language of 18 U.S.C. § 1084 makes no distinction between those engaged in the business of gambling on their own behalf and those engaged in that business on behalf of others. Moreover, the purpose of section 1084 is better served by imposing the duties and penalties upon those who would use communications facilities in the day-to-day operation of the gambling business * * *."

* * * [B]ookmakers are dependent upon telephone service for the placing of bets and for layoff betting on all sporting events. The availability of wire communication facilities affords opportunity for the making of bets or wagers and the exchange of related information almost to the very minute that a particular sporting event begins."

---

2. In considering the enactment of § 1084, House Report No. 967, 87th Cong., 1st Sess. (1961), U.S.Code Cong. & Ad.News, Vol. 2, pp. 2631–2632 states what is almost axiomatic:

"Testimony before your Committee on the Judiciary revealed that modern bookmaking depends in large measure on the rapid transmission of gambling information by wire communication facilities.

With regard to the evidence adduced as to Count 1, Baffetta was given the point spread in several football games and the weather conditions. As Baffetta explained, a knowledge of weather conditions is a significant factor in betting on football games where the point spread type of betting is utilized—the favored team would be more likely to win by less of a margin than anticipated if the playing field were slow. Truchinski argues that there was no showing that Baffetta used the information obtained on October 15, 1966 to assist him in placing the bets made on October 16, 1966. The Government argues that inasmuch as bets were placed, the jury could properly conclude that the telephone conversation of October 15 furnished Baffetta with information in order that he might place bets the following day. While we express an inclination to agree with the Government's position, we need not sustain it as the sentence imposed on Counts 1 and 2 was a general sentence and was less than that which could have been imposed on either count,[3] and we hold the Count 2 conviction must stand. Lawn v. United States, 355 U.S. 339, 359, 362, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958); Atkinson v. United States, 344 F.2d 97, 98 (8 Cir. 1965), cert. denied 382 U.S. 867, 86 S.Ct. 141, 15 L.Ed.2d 106; White v. United States, 330 F.2d 811, 812 (8 Cir. 1964), cert. denied 379 U.S. 855, 85 S.Ct. 105, 13 L.Ed.2d 58; Isaacs v. United States, 301 F.2d 706, 733 (8 Cir. 1962), cert. denied 371 U.S. 818, 83 S.Ct. 32, 9 L.Ed.2d 58.

With regard to Count 2, while Truchinski again contends that there was no showing of anything by way of information which could in any manner assist Baffetta in making a bet, we think otherwise. Truchinski called Baffetta and informed him that "there wasn't much doing that day, only two games going that day." Baffetta then placed a two-team parlay bet for $30. Patently, the conversation was initiated by Truchinski supplying Baffetta with information as to what betting "action" was available and Baffetta responded by placing his bet. Considering the method of operation of those generally engaged in the taking of bets, the frequency with which Baffetta would place bets with Truchinski, plus the fact that a bet was placed, the conversation clearly demonstrates proscribed activity under the statute. A jury could properly conclude that Truchinski transmitted information assisting in the placing of bets or wagers on a sporting event.

Truchinski's second assignment of error is that the trial court should have granted his motion and examined the minutes of the grand jury to determine whether evidence presented before the grand jury included evidence which had been obtained as the result of an illegal search and seizure. Truchinski asserts that if such an examination had revealed illegally seized evidence was before the grand jury, his motion to dismiss the indictment should have been granted, citing United States v. Yuck Kee, 281 F. 228 (D.C.Minn.1922); United States v. Bush, 269 F. 455 (D.C.N.Y.1920); In re Marx, 255 F. 344 (D.C.Cal.1918); United States v. Mounday, 208 F. 186 (D.C.Kan.1913).

We believe that under the circumstances of this case, and the showing made by Truchinski, that no error was committed in denying his motion.

On March 12, 1966, Truchinski was arrested in New Britain pursuant to a warrant for his arrest based on a complaint submitted to a United States Commissioner in the District of Minnesota upon the affidavit of Special Agent Peterson of the Treasury Department. Truchinski was informed he was arrested for a federal wagering violation. His person and automobile were searched and certain items were seized—bet slips (a paper recording a bet made), basketball schedules, and various crumpled-up papers and notes. His automobile was confiscated. On March 15, 1966, Tru-

---

3. 18 U.S.C. § 1084(a) provides that the offender shall be fined not more than $10,000 or imprisoned not more than two years, or both.

chinski was indicted by a Federal Grand Jury in the District of Minnesota.

On August 8, 1966 Truchinski filed a motion to suppress the evidence seized from him pursuant to his arrest. He also filed a motion to dismiss the indictment because of its being vague and indefinite and being in contravention of the First and Fifth Amendments. A hearing on the motion to suppress was held on August 8–9, 1966, before Chief Judge Devitt. Government Agents stationed in Minneapolis who participated in Truchinski's arrest in New Britain testified. The nature of the items seized in conjunction with the arrest was ascertained, as well as the name of the informant (Joseph Baffetta), whose information led to the complaint and warrant being issued. At the conclusion of the hearing the Court indicated that Truchinski's automobile should be returned forthwith, and an order so commanding was duly entered on August 10, 1966. On October 19, 1966, Truchinski withdrew his motion to dismiss the indictment. On October 28, 1966, Judge Devitt granted Truchinski's motion for the return of the other property seized and to suppress evidence obtained from the search incident to the arrest on March 12, on the ground "that the arrest warrant was issued without a proper showing of probable cause."

On November 3, 1966 at 10:00 a. m., the date and time assigned for trial, Truchinski made his second motion to dismiss the indictment followed by a motion for the Court to examine the grand jury minutes to determine whether "any evidence adduced before the Grand Jury which gave rise to this Indictment impinged, included or was derived from evidence which has been ordered suppressed." Judge Nordbye denied the motions.

Rule 12(b) (2), Fed.R.Crim.P., provides that "Defenses and objections based on defects * * * in the indictment * * * may be raised only by motion before trial." The Rule further provides, "The motion shall include all such defenses and objections then available to the defendant. Failure to present any such defense or objection * * * constitutes a waiver thereof, * * * *." We believe that Truchinski's motions being directed primarily against the indictment were not timely raised under Rule 12(b) (2) and (3) and were properly denied. Truchinski's claim that he could not have known until Judge Devitt ruled on the suppressibility of the evidence whether a basis for the motions would lie is without merit. The same grounds on which Truchinski argued for the motion to suppress on August 8–9, were available to him at that time in support of his motion to dismiss the indictment. If Truchinski desired that the minutes of the grand jury be examined to determine if illegally seized evidence had been presented to it, and if he wanted to raise the argument that the indictment should be dismissed where such evidence has been considered, the motions could have, and should have, been raised on August 8, when the motion to dismiss the indictment was filed. His failure to do so constituted a waiver of any complaint as to evidence before the grand jury. West v. United States, 359 F.2d 50, 57 (8 Cir. 1966), cert. denied 385 U.S. 867, 87 S.Ct. 131, 17 L. Ed.2d 94; Rule 12(b) (2), Fed.R.Crim. P.

Further, a motion to dismiss an indictment because of the incompetency of evidence before the grand jury is addressed to the discretion of the trial court, and the decision to deny the motion will not be reversed unless there has been an abuse of that discretion. United States v. Tane, 329 F.2d 848, 853 (2 Cir. 1964); Carrado v. United States, 93 U.S.App.D.C. 183, 210 F.2d 712, 717 (1953), cert. denied 347 U.S. 1018, 74 S.Ct. 874, 98 L.Ed. 1140; Stewart v. United States, 300 F. 769, 777 (8 Cir. 1924). The fact that the conviction of Truchinski was based entirely on evidence admissible before the trier of fact demonstrates that Judge Nordbye did not abuse his discretionary power in this respect. In fact, it is apparent that the grand jury heard the witness Baffetta,

the principal Government witness, and scrutinized the documentary evidence relating to the phone calls, all of which evidence was competent and independent of the suppressed evidence. Therefore, it would have been inappropriate to dismiss the indictment, even if some incompetent evidence had been placed before the grand jury.[4] As noted in United States v. Tane, at pp. 853–854 of 329 F.2d, "As long as there is some competent evidence to sustain the charge issued by the Grand Jury, an indictment should not be dismissed. Coppedge v. United States, 311 F.2d 128, 132 [114 U.S.App.D.C. 79] (D.C. Cir. 1962), reversed on other grounds 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962)."

A reading of the record clearly shows that the Government's case was not buttressed in any manner by the items illegally seized from Truchinski, and Truchinski does not claim that any of these items were introduced at the trial. The cases cited by Truchinski are distinguishable. Timeliness of the motions raised was not at issue. Substantively, in *Yuck Kee*, supra, and *Bush*, supra, the indictments were dismissed on the grounds that the illegally seized evidence was the sole evidence on which the grand jury returned its indictment; in *Marx*, supra, the issue between the Government and the defendant was the ownership of illegally seized papers, the Government being denied the use of such papers before a grand jury, where if the defendant was, in fact, the owner of such papers no offense could have been committed by him; and in *Mounday*, supra, the Court refused to permit the Government to present illegally seized papers before a grand jury where the question was raised in advance of investigation by the grand jury. Truchinski makes no claim that the indictment returned against him was based solely on the illegally seized evidence.

Since the decision by the Supreme Court in Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956) it is settled that an indictment cannot be vitiated because it is based solely or in part on incompetent evidence.[5] Where the incompetency of the evidence arises from a violation of the constitutional rights of the accused, a different question may be presented. See, 100 L.Ed. 404–412 (1956), Anno.: Indictment—Evidence. However, in Lawn v. United States, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958) the Supreme Court, in considering whether an indictment was vulnerable to attack because some of the evidence presented to the grand jury was obtained in violation of the accused's right against self-incrimination, announced a broad rule with regard to the sufficiency of evidence supporting an indictment.

> "[A]n indictment returned by a legally constituted nonbiased grand jury, like an information drawn by a prosecutor, if valid on its face, is enough to call for a trial of the charge on the merits and satisfies the requirements of the Fifth Amendment." 355 U.S. at 349, 78 S.Ct. at 317.

Federal District Courts have tended to follow the language of *Lawn* holding that an indictment is not subject to dismissal even though illegally seized evidence was before the grand jury.

As noted in *Lawn*, supra, at p. 350, 78 S.Ct. at 318:

> "It should be unnecessary to say that we are not here dealing with the use of incompetent or illegal evidence in a trial on the merits, nor with the right to decline to give incriminating testimony in legal proceedings or to

---

4. Actually it is doubtful if any incompetent evidence at all was presented to the grand jury. The Assistant United States District Attorney, in responding to a direct interrogation by the Court, stated that as an officer of the court " * * * [T]he Indictment is in no way based upon any evidence or information obtained from the defendant as a result of the arrest, search and seizure which was held illegal by Judge Devitt."

5. In *Costello* only hearsay evidence was presented to the grand jury which indicted the defendant.

suppress the direct or derivative use at the trial of evidence illegally obtained."

In United States v. D'Angiolillo, 340 F.2d 453 (2 Cir. 1965), cert. denied 380 U.S. 955, 85 S.Ct. 1090, 13 L.Ed.2d 972, the Court found searches and seizures by the police and federal agents to be "flagrant" violations of the defendants' constitutional rights, but held that dismissal of the indictments would not be the appropriate sanction stating:

"The convictions were obtained solely on the basis of lawfully acquired evidence. The law calls only for exclusion, and we do not think that the public interest would be served by requiring more than this in the exercise of our supervisory power over the administration of criminal justice." 340 F.2d at 456.

In short, as this Court recognized in *West,* supra, at pp. 55–56 of 359 F.2d, the exclusionary rule should not be extended to grand jury proceedings.

This is not to say that a defendant upon timely motion cannot demonstrate a "particularized need" for at least the Court's *in camera* examination of grand jury minutes to determine if defendant's motion to dismiss the indictment is well taken. No such showing was here made, however, and we do not venture to lay down an inflexible rule in a sensitive area of the law where determination on a case-by-case basis better serves the ends of justice.

As recognized in *Lawn,* supra, and *D'Angiolillo,* supra, and as stated in *West,* supra, at p. 56 of 359 F.2d: "The real issue, the substantial issue is appellant's guilt of the charge made. Was the properly admitted evidence sufficient to find him guilty beyond a reasonable doubt." Truchinski makes no claim that the evidence introduced at trial was erroneously admitted or that he was prejudiced in any way by the evidence presented to the trier of fact. The issues

were properly submitted and tried and the Court did not err in denying Truchinski's motion to inspect the grand jury minutes.

 Truchinski's final assignment of error is that 18 U.S.C. § 1084 (a) is an unconstitutional abridgment of freedom of speech in proscribing the interstate transmission of information assisting in the placing of wagers or bets. Truchinski argues that Congress would not tax an activity it deemed to be a "substantive evil." The fact that Congress taxes an activity is not a criterion as to the lawfulness or unlawfulness of such an activity. In Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968), the Supreme Court stated at p. 44, 88 S.Ct. at p. 700:

"The Court has repeatedly indicated that the unlawfulness of an activity does not prevent its taxation, and nothing that follows is intended to limit or diminish the validity of those cases."

The same argument Truchinski now raises was answered in United States v. Kelley, 254 F.Supp. 9, 15 (S.D.N.Y. 1966):

"The use of interstate facilities to further the commission of illegal activities, whether those activities be federal or purely state in nature, is within the regulatory power of Congress. See generally Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951). The 'substantive evil' sought to be curtailed is the use of a federally controlled means of communication to violate state penal statutes. This being the case, the provisions of Section 1084 do not trespass on the first amendment guarantee of free speech."

Truchinski cannot use the First Amendment's protection of freedom of speech to cloak his proscribed conduct.

The judgment of the District Court is affirmed.