The **UNITED STATES of America,**
Appellee,

v.

**John Matthew STONEHOUSE, Appellant.**

No. 71–1298.

United States Court of Appeals,
Seventh Circuit.

Nov. 2, 1971.

Peter C. Fieweger, Franklin S. Wallace, Katz, McAndrews, Durkee & Telleen, Rock Island, Ill., for appellant.

Donald B. Mackay, U. S. Atty., Springfield, Ill., Max J. Lipkin, Asst. U. S. Atty., Peoria, Ill., for appellee.

Before KILEY, PELL and STEVENS, Circuit Judges.

STEVENS, Circuit Judge.

During 1969 appellant was the operator of a tavern in Rock Island, Illinois, at which he regularly accepted wagers on sporting events in violation of Illinois law. He has appealed his conviction on both counts of an indictment charging violation of two federal statutes, 18 U. S.C. § 1084(a) and § 1952. Each count raises a question of statutory construction; in addition, he challenges the admissibility of the evidence tending to prove that the Western Union ticker tape machine in his tavern was an interstate facility.

*I. Count I.*

■ The appeal from the conviction on Count I raises a precise issue. Does the activity of a professional gambler which is prohibited by § 1084(a) include the mere receipt as well as the transmission of the kind of information described in the statute? The issue is starkly presented because appellant's ticker tape enabled him to receive, but not to transmit, information which assisted in the placing of bets on sports events. The ticker tape is, therefore, unlike a telephone which provides a means for communication between two persons, each of whom normally transmits, as well as receives, some information during any use of the facility.

Although we recognize that there is language in at least one case involving the use of the telephone that points in the other direction [1], we believe that the coverage of paragraph (a) of § 1084 is limited to prohibited transmissions and

---

1. Sagansky v. United States, 358 F.2d 195, 200 (1st Cir. 1966), cert. denied, 385 U.S. 816, 87 S.Ct. 36, 17 L.Ed.2d

55. Truchinski v. United States, 393 F.2d 627 (8th Cir. 1968), cert. denied, 393 U.S. 831, 89 S.Ct. 104, 21 L.Ed.2d

does not encompass mere reception. Our conclusion is supported by the text of the statute, by its legislative history, and by the carefully considered opinion in Telephone News System, Inc. v. Illinois Bell Telephone Co., 220 F.Supp. 621 (N.D.Ill.1963), affirmed, 376 U.S. 782, 84 S.Ct. 1134, 12 L.Ed.2d 83.

In that case the court rejected a Government contention that the word "transmission" as used in paragraph (a) meant receiving as well as sending:

> "In support of this position, the government urges that the term 'transmission' as used in subsection (a) does not mean 'sending,' but rather means sending or receiving. Therefore, it maintains, Retelle violated subsection (a) when he received information from plaintiff over the telephone.

> "We must reject the theory that 'transmission' as used in subsection (a) means sending or receiving. Whatever validity there might be to the argument that 'transmission,' in some contexts, has a meaning broader than the term 'sending,' it is plain that Congress meant it as 'sending' in this statute. Subsection (d) uses the term 'transmitting or receiving,' and

it is illogical to suppose that Congress would not have used both terms in both subsections had it meant to include 'receiving' in subsection (a). We shall not assume that 'transmission' has one meaning in subsection (a) and another in subsection (d), nor that 'receiving' in subsection (d) is superfluous." 220 F.Supp. at 638.

In this case the Government advances a different argument. It contends that the statutory phrase "for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers * * *" modifies the noun "facility" rather than the verb "uses."[2] This is not a tenable interpretation of the section. Unless the phrase modifies the verb, a professional gambler would violate § 1084(a) whenever he made an innocent use of a facility which someone else had used for an illegal purpose. Cf. United States v. Judkins, 428 F.2d 333 (6th Cir. 1970).

Moreover, the somewhat different language used in the House Report also indicates that the qualifying language was intended to modify the verb "uses" rather than the noun "facility."[3] A reading of § 1084 in its entirety corroborates

---

103, cited by the government for the proposition that transmission is unnecessary, clearly does not support this conclusion because the court there wrote: "[A] jury could properly conclude that Truchinski *transmitted* information assisting in the placing of bets or wagers on a sporting event." 393 F.2d at 631. (Emphasis added.)

2. The full text of the subsection is as follows:

> "(a) Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers, shall be fined not more than

$10,000 or imprisoned not more than two years, or both." 75 Stat. 491.

> If the Government's construction of this section were correct, the words "which is used" should have been inserted after the word "facility."

3. "Subsection (a) of the new section prohibits those persons who are engaged in the business of betting or wagering from knowingly using a wire communication facility for the transmission of bets or wagers or information assisting in the placing of bets or wagers in interstate or foreign commerce on any sporting event or contest. It also prohibits the transmission of a wire communication which entitled the recipient to receive money or credit as a result of a bet or wager or for information assisting in the placing of bets or wagers. A penalty of $10,000 or imprisonment not more than 2 years, or both, is placed upon such *transmission.*" U.S.Code Cong. and Admin.News (1961) p. 2632. (Emphasis added.)

our conclusion that paragraph (a) is limited to "transmission," since the intent to encompass "transmitting or receiving" by the civil remedy authorized in paragraph (d) was plainly specified by using both words.

We, therefore, hold that the conviction on Count I must be reversed.

## II. *Count II.*

■ Appellant contends that the evidence did not prove that the ticker tape had been used "to facilitate" gambling within the meaning of the Travel Act, 18 U.S.C. § 1952. He contends there was no evidence that any specific bet was placed or any specific payment made on the basis of information received over the ticker tape. For purposes of decision we accept appellant's version of the record, but hold that such evidentiary detail was not essential to sustain a conviction.

The record plainly establishes that the gambling enterprise was a regular and significant portion of the business carried on in appellant's tavern. Even if the prompt availability of sporting information did nothing more than advertise the business and attract patrons to the premises where wagers were being solicited and taken, we believe the jury could properly conclude that appellant had installed and used the ticker tape with intent to " * * * facilitate the promotion, management, establishment, or carrying on * * * " of his unlawful activity. *Cf.* United States v. Miller, 379 F.2d 483, 485 (7th Cir. 1967),[4] cert. denied, 389 U.S. 930, 88 S.Ct. 291, 19 L. Ed.2d 281; United States v. Lookretis, 422 F.2d 647 (7th Cir. 1970), cert. denied, 398 U.S. 904, 90 S.Ct. 1693, 26 L. Ed.2d 63.

## III. *Evidence That the Ticker Tape Was an Interstate Facility.*

Dean Gerard, the manager of Western Union's Moline office, testified that in 1959 only two ticker tape machines were in service in Rock Island, one leased to appellant and the other to the local television station. He explained that Western Union gathered sporting information from various parts of the country at a center in Chicago where the information was compiled on a punch tape and sent out over a network to users' machines, which then printed the results on tape. When asked how information was sent from Chicago to Rock Island, he responded:

"A  Well, we have a circuit that comes from Chicago. It is—goes to our Davenport, Iowa office, where our wire chamber is at.

"Q  I'm sorry. I don't know whether the jury understood what you said after 'Davenport, Iowa.'

"A  Well, there the incoming signals coming in through what is called a repeater. The repeater amplifies the signal and it is sent out from there to wherever the customers are at."

On cross-examination he acknowledged that he had never examined the circuitry himself and, therefore, did not know the exact circuitry of his own knowledge. Appellant then moved to strike the earlier testimony to the effect that the transmission from Chicago to Rock Island was routed via Davenport, Iowa. The motion was denied.

Thereafter, on redirect examination, Gerard produced a "Patron Maintenance and Trouble Log" for the machine used by appellant. The log made reference to two instances of service to appellant's installation in 1969 and contained a cir-

---

4. We do not view the fact that payoffs may have been made on the basis of the ticker reports as essential to that decision. The court wrote: "They wanted the ticker in their establishment so that the customers could check the scores. They provided blackboards so that scores obtained from the ticker could be posted. They knew that these scores would be of interest to their baseball pool customers." 379 F.2d at 485.

cuit map sketched schematically, purporting to diagram the circuitry from Davenport, Iowa, to Moline and thence to Rock Island, Illinois.[5] Gerard testified that the log had been prepared by a maintenance man no longer in Western Union's employ, that it was the ex-employee's job to prepare and make entries in such documents, and that the log came from the regular files of the company. Over appellant's objections, the document was received in evidence.

Appellant offered no evidence tending to dispute the showing that the circuit was routed from Chicago to Rock Island via Davenport. On appeal he argues that the testimony and the exhibit were both inadmissible and, if excluded, the record would contain no evidence of an interstate transmission. We believe Judge Morgan's evidentiary rulings were correct.

We recognize, as appellant argues, that the prosecutor has the burden of proving guilt beyond a reasonable doubt, and presumably the testimony of an engineer who had personally traced the circuit would have been more reliable than the evidence which was adduced. It is clear, however, that the information made available to the jury was that on which Western Union personnel relied in the regular course of business, and the likelihood that the local office manager or the maintenance man would incorrectly understand or describe the basic circuitry is remote.[6] This is the kind of evidence "which ex-

perience has shown to be quite trustworthy," Palmer v. Hoffman, 318 U.S. 109, 113, 63 S.Ct. 477, 480, 87 L.Ed. 645. See also Thomas v. Hogan, 308 F.2d 355, 358 (4th Cir. 1962).

The conviction on Count I is reversed. The judgment on Count II is affirmed.

---

5. The diagram identified the nature of the circuitry as well as its routing. The connection between Davenport and Moline was "W. U. CABLE" and from Moline to Rock Island it was "B FONE PR/7WU 2543." The purpose of the diagram was obviously to facilitate the work of the maintenance man if a defect in the circuit required repair or adjustment. The primary utility of the document was to assist routine maintenance; there is nothing to suggest that it was prepared in contemplation of litigation. *Cf.* Palmer v. Hoffman, 318 U.S. 109, 113–114, 63 S.Ct. 477, 87 L.Ed. 645.

6. The Business Records Act expressly provides that circumstances which may affect the weight of the evidence do not necessarily affect its admissibility. See 28 U.S.C. § 1732(a). See also Rule 803 (6) of the Proposed Rules of Evidence for the United States Courts and Magistrates (March, 1971, revised draft) which provides for the business records exception to the hearsay rule.

There can be no doubt that the log was made in the ordinary course of business and its trustworthiness is enhanced by the fact that it was used for maintenance purposes, which would surely require that the correct circuitry be known in order to facilitate repair.