UNITED STATES of America,
Plaintiff-Appellee,

v.

Paul P. ERLENBAUGH et al.,
Defendants-Appellants.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Adrian J. WHITE et al., Defendants-
Appellants.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Frank J. KELLY, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Raymond J. KULIK et al., Defendants-
Appellants.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Edward Joseph MISIOLEK et al.,
Defendants-Appellants.

Nos. 18761, 18762, 18764, 18765
and 71–1140.

United States Court of Appeals,
Seventh Circuit.

Nov. 30, 1971.

Certiorari Granted March 6, 1972.
See 92 S.Ct. 1194.

Charles W. Grubb, Cedar Lake, Ind., for Paul P. Erlenbaugh and others.

William C. Lee, U. S. Atty., Fort Wayne, Ind., Craig Bradley, Atty., U. S. Dept. of Justice, Washington, D. C., for the United States.

Before FAIRCHILD, PELL and SPRECHER, Circuit Judges.

SPRECHER, Circuit Judge.

These consolidated appeals challenge the validity of judgments of conviction entered upon jury verdicts which found the defendants guilty of conspiring to violate 18 U.S.C. § 1952 contrary to 18 U.S.C. § 371 and of substantive violations of 18 U.S.C. § 1952.

The issue common to all five appeals is whether the use of a "scratch sheet," delivered by interstate railroad, in a bookmaking operation constitutes use of an interstate facility under § 1952 of the Travel Act, in view of the fact that the scratch sheet is a "newspaper or similar publication" under § 1953(b) (3), to which § 1953(a), prohibiting the sending or carrying of bookmaking paraphernalia, does not apply. Some of the appeals also challenge (1) rulings on instructions on intent and specific intent, (2) refusal to give instructions on using or causing to use a railroad as an interstate facility, (3) refusal to give an in-

struction on burden of proof where the defense of alibi was relied upon, (4) refusal to give a requested instruction on conspiracy, and (5) sufficiency of the evidence.

I

In No. 18761, Paul P. Erlenbaugh, William H. Mitchell and John C. Hintz were convicted upon a jury trial under 18 U.S.C. § 371 for conspiracy to violate 18 U.S.C. § 1952, and Mitchell and Hintz were also convicted on two counts each of violations of 18 U.S.C. § 1952. Erlenbaugh was sentenced to two years (six months to be served) followed by three years of probation. Mitchell and Hintz were given concurrent suspended sentences of two years with three years' probation.

During the period August 13 to October 29, 1968, the Illinois Sports News, a publication containing horse racing information and known as a scratch sheet, was published in Chicago, Illinois, daily except Sunday. On each publication day approximately 90 copies in a brown manila envelope were put on the 8:30 A.M. train of the Chicago, South Shore and South Bend Railroad at the Randolph Street station in Chicago for delivery to the Hammond, Indiana, station at 9:02 in the morning.

At ten o'clock every day George Frost, an employee of Hammond News Agency, went to the Hammond station and picked up the brown envelope which at that time of day contained only 30 copies of the scratch sheet and two smaller envelopes with money. The Hammond News Agency was billed by and paid the Illinois Sports News for the 90 daily copies at 20 cents each and resold the copies for 35 cents each. Frost testified that a Ray Goodman was authorized to pick up 22 copies daily and to pay Hammond News Agency weekly for those copies. The money picked up by Frost each day was equal to the difference between 68 (90 less the 22 taken by Goodman) and 30 scratch sheets multiplied by 35 cents.

Frost then delivered the 30 remaining sheets to three customers, the Alexander Book Store (7 copies), Friendly Billiards (13 copies) and the balance to the Sibley Newsstand. Frost also delivered the money to the Sibley Newsstand and Sibley was billed by and paid the Hammond News Agency at 30 cents a copy for the number of sheets it received and for the number of sheets represented by the money it received.

A bookmaking operation was conducted by Erlenbaugh on the premises known as Paul's Smoke Shop at 103 State Street, Hammond. Customers entered the bookmaking enterprise through a rear door opened by a doorkeeper who peered out in response to a knock on the door. Erlenbaugh and Mitchell took bets there. On many days between August 13 and October 29, 1968, Hintz would arrive at the South Shore railroad station in Hammond at about 9:00 A.M. in a 1959 green Pontiac. When the train arrived, the conductor would hand the station porter two envelopes, one containing the Illinois Sports News and the other containing another scratch sheet. The porter took the envelopes to the baggage room where they were opened, usually by Roy Woodward. Hintz and two or three other persons gathered around and each one took a quantity of scratch sheets and departed. Hintz went directly to 103 State Street, where the sheets were immediately utilized by the betting customers. The information contained in the scratch sheets came out earlier each day and was more complete than the horse racing information contained in regular newspapers.

In No. 18762, upon a jury trial, Adrian J. White was convicted on four counts, John C. Hintz (the same defendant as in No. 18761) on three counts and James Lloyd on two counts in violation of 18 U.S.C § 371 and § 1952. White received concurrent sentences of two years (six months to be served) and three years' probation; Hintz and Lloyd were given concurrent suspended sentences of two years with three years' probation.

The facts proved in 18762 were similar to those in 18761, except that the bookmaking establishment was conducted by

White on premises known as State Recreation located at 658 State Street, Hammond. White and Hintz took bets there. Hintz and sometimes Lloyd picked up the scratch sheets at the train station and delivered them to the bookmaking premises, where they were promptly used in the operation.

In No. 18764, upon a jury trial, Frank J. Kelly was convicted on one count in violation of 18 U.S.C. § 1952 and on one count of conspiracy to violate § 1952 in violation of 18 U.S.C. § 371. He received concurrent sentences of two years (six months to be served) followed by three years of probation.

The facts proved in 18764 were similar to those in 18761, except that Kelly's bookmaking establishment was located at 519 Conkey Street, Hammond. Ray Goodman, who worked for Kelly, had agreed with George Frost of the Hammond News Agency that Goodman would pick up Kelly's copies of the Illinois Sports News directly at the Hammond station and deliver them to Kelly's establishment.

In No. 18765, upon a jury trial, Raymond J. Kulik was convicted on four counts and Eddie Dobrowski was convicted on three counts of violating 18 U.S.C. § 371 and § 1952. Kulik received concurrent sentences of two years (six months to be served) followed by three years' probation. Dobrowski was given concurrent suspended sentences of two years with three years' probation.

The facts proved in 18765 were similar to those in 18761, except that the bookkeeping operation was carried on at 4534 Hohman Avenue, Hammond, by Kulik. Kulik and Dobrowski took bets there. Ray Goodman delivered copies of the Illinois Sports News to 4534 Hohman Avenue.

In No. 71–1140, upon a jury trial, Edward Joseph Misiolek, Robert Ray Tumlin and Alex Strosky were each convicted upon four counts in violation of 18 U.S.C. §§ 371 and 1952. Misiolek and Strosky were sentenced to concurrent terms of two years (six months to be served) followed by three years' probation. Tumlin was given a concurrent suspended sentence of two years with three years' probation on one count; imposition of sentence was withheld on three counts.

The facts proved in 71–1140 were similar to those in 18761, except that the bookmaking establishment was conducted on premises known as the Four Acres Recreation Bar located on 112th Street, Hammond, where Tumlin took bets and where Misiolek and Strosky were observed. Roy Woodward daily picked up several copies of the Illinois Sports News at the Hammond railroad station. On several occasions during September and October, 1968, Woodward left some of the scratch sheets at Sander's Restaurant where one Joe Barnett picked them up and drove off in a Cadillac accompanied by Tumlin or Misiolek. They drove to the J & J Body Shop, parked the car and walked to the Four Aces, where the sheets were utilized in the betting operation.

In all five cases, evidence was introduced showing that the number of scratch sheets ordered by Hammond News Agency dropped off sharply after the five bookmaking operations were shut down shortly prior to the indictments.

## II

The principal question urged by all defendants is whether, since Illinois Sports News is a newspaper, the shipping of this newspaper by means of an interstate carrier constitutes the use of an interstate facility sufficient to charge the defendants with violations of the Travel Act.

Section 1953(a) provides in part, "Whoever, except a common carrier in the usual course of its business, knowingly carries or sends in interstate commerce any * * * paraphernalia, * * * paper, [or] writing * * * used, or to be used * * * in * * * bookmaking * * * shall be fined * * * or imprisoned * * * or both."

Section 1953(b) provides in part, "This section shall not apply to * * * (3) the carriage or transportaion in interstate * * * commerce of any newspaper or similar publication."

In United States v. Kelly, 328 F.2d 227 (6th Cir. 1964), the court of appeals held that the Louisville Daily Sport News, which was published by the Kelly family (who also published the Illinois Sports News) and which was made up of material copied from the Illinois Sports News, came within the ambit of "any newspaper or similar publication" and was therefore exempt from the operation of § 1953. The court held, therefore, that the Kellys were entitled to a directed verdict of acquittal. The same Kellys successfully enjoined the telephone company from terminating its services used by them in receiving and transmitting racing news to be published in the Illinois Sports News and their other publication in Kelly v. Illinois Bell Telephone Co., 210 F.Supp. 456 (N.D.Ill. 1962), aff'd, 325 F.2d 148 (7th Cir. 1963). In granting and affirming the injunction, it was necessary for both courts to find that the activities of the Kellys did not violate 18 U.S.C. §§ 1952 or 1953. In its opinion, this court expressly found that "plaintiffs accept no bets or wagers either by wire communication facilities or otherwise."[1] 325 F. 2d at 151.

In the five cases on appeal there is no charge that the defendants violated § 1953, but rather that they violated § 1952(a) (3), which provides in part, "Whoever * * * uses any facility in interstate * * * commerce * * * with intent to * * * promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity" shall be fined or imprisoned or both.[2] There is no denial by any of the defendants that they were all engaged in a business enterprise involving bookmaking or gambling unlawful under Indiana law.[3]

The evidence in all the cases showed that the scratch sheets were picked up daily (except Sunday) at the Hammond railroad station as soon as the train arrived and were promptly taken to the gambling establishments where they were widely utilized by the patrons and the defendants in connection with the placing of bets. The evidence further showed that the racing information contained in the Illinois Sports News was available more rapidly and in more convenient fashion than similar information published in the daily newspapers.

In United States v. Miller, 379 F.2d 483 (7th Cir., cert. denied, 389 U.S. 930, 88 S.Ct. 291, 19 L.Ed.2d 281 (1967), this court affirmed the convictions under 18 U.S.C. § 1952 of three

1. Persons who likewise accepted no bets or wagers but supplied odds quotations to bookmakers and gamblers were held to be "within the ambit" of 18 U.S.C. § 1084 (d) which requires the termination of telephone service used for interstate transmission of gambling information in violation of state law, where the transmission was "rapid," despite the provision of § 1084(b) that "[n]othing in this section shall be construed to prevent the transmission in interstate * * * commerce of information for use in news reporting of sporting events or contests * * *." Telephone News System, Inc. v. Illinois Bell Telephone Co., 210 F.Supp. 471 (N.D.Ill.1962), 220 F.Supp. 621 (N.D.Ill.1963) (three judge court), aff'd, 376 U.S. 782, 84 S.Ct. 1134, 12 L.Ed.2d 83 (1964); Angelini v. Bell Telephone Co., 418 F.2d 111 (7th Cir. 1969), cert.

denied, 397 U.S. 1040, 90 S.Ct. 1361, 25 L.Ed.2d 651 (1970).

2. The defendants were also charged and some convicted of conspiring to violate 18 U.S.C. § 1952(a) (3) in violation of 18 U.S.C. § 371. They were also charged and convicted under the aiding and abetting statute, 18 U.S.C. § 2.

3. The defendants were charged with violating Burns Indiana Statutes (1956 Replacement) Sections 10–2304, 10–2307, 10–2311 and 10–2331, IC 1971, 35–1–104–4, 35–1–104–7, 35–1–104–11, 35–25–1–3. Section 1952(b) provides in part, "As used in this section 'unlawful activity' means * * * any business enterprise involving gambling * * * offenses in violation of the laws of the State in which committed. * * * "

defendants who obtained baseball scores from a Western Union tickertape originating in Chicago, Illinois and posted them on a blackboard in Gary, Indiana in connection with the operation of a baseball gambling pool unlawful under Indiana law. Judge Cummings, after a painstaking analysis of the meaning of the words "uses any facility * * * to * * * facilitate * * *" said (379 F.2d, pages 485, 486):

> "As proprietor and operator, respectively, of this business, the defendants were responsible for the installation and presence of the ticker on their premises. They wanted the ticker in their establishment so that the customers could check the scores. They provided blackboards so that scores obtained from the ticker could be posted. They knew that these scores would be of interest to their baseball pool customers. With defendants' knowledge and approval, their customers promoted the pool by posting the scores obtained from the tickertape. These activities constituted a 'use' of an interstate facility by defendants.

> \*   \*   \*   \*   \*   \*

> "It is true that the baseball pool could have been operated without the ticker, but nevertheless the ticker was maintained to obtain results as quickly as possible for the gambling customers. Section 1952 does not require that the ticker be essential to the gambling operation; it need only 'facilitate' the carrying on of the illegal gambling. As used in this statute, 'facilitate' means 'to make easy or less difficult.' United States v. Barrow, 212 F.Supp. 837, 840 (E.D.Pa.1962). The testimony of FBI Agents Cox and Hagan amply supports the jury's finding that defendants facilitated the carrying on of this gambling operation by keeping the ticker on their premises."

In each of the present cases, FBI agents testified in detail regarding the use of the scratch sheets by defendants and their patrons as a vital element in the bookmaking operation.

This court reached results similar to *Miller* in United States v. Lookretis, 422 F.2d 647 (7th Cir.), cert. denied, 398 U.S. 904, 90 S.Ct. 1693, 26 L.Ed.2d 63 (1970) (Western Union tickertape service, contracted for by defendants, furnished baseball scores which were then posted in connection with operation of a baseball pool), United States v. Stonehouse, 452 F.2d 455 (7th Cir. 1971) (Western Union tickertape), and United States v. Rizzo, 418 F.2d 71 (7th Cir. 1969), cert. denied, 397 U.S. 967, 90 S.Ct. 1006, 25 L.Ed.2d 260 (1970) (mailing of credit cards by defendants for use in unlawful prostitution).

Although the tickertape and credit cards were lawful in and of themselves, their "use" by state lawbreakers to "facilitate" the unlawful activity constituted the § 1952 violation. Apparently the defendants here would seek to distinguish these cases for the reason that a "newspaper or similar publication" is expressly exempted from the operation of § 1953. This issue was decided against the defendants in United States v. Ross, 374 F.2d 227 (6th Cir. 1967), vacated on other grounds sub nom. Stone v. United States, 390 U.S. 204, 88 S.Ct. 899, 19 L.Ed.2d 1035 (1968), where the interstate devices were also scratch sheets, namely "Angel-Kaplan Sports Publications" mailed from Chicago to Nashville, Tennessee. The court of appeals affirmed a § 1952 conviction where the defendant "used this publication for his convenience in his business" of "booking bets and wagers on athletic games in season" (374 F.2d page 230). We have recently affirmed the conviction under § 1952 of Angelini (the "Angel" of Angel-Kaplan), holding that "the evidence was sufficient to establish that Angelini made use of the mails to distribute the line to his out-of-state [gambling] customer * * *." United States v. Cerone, 452 F.2d 274, at 290, 291 (7th Cir. 1971). In that case, Angelini was shown to be part of the bookmaking operation as well as the publisher of the scratch sheet, contrary to the *Kelly* cases, *supra* where the publishers did not

themselves accept bets or wagers. Two district courts have also held that a conviction may be sustained under § 1952 even though the interstate device is a scratch sheet exempt under § 1953. United States v. Azar, 243 F.Supp. 345 (E.D. Mich.1964) ("numbers" game tip sheet printed in Ohio and distributed in Michigan); United States v. Kish, 303 F. Supp. 1212 (N.D.Ind.1969) (Illinois Sports News transmitted by train from Chicago to South Bend, Indiana).

The only case cited by the defendants is United States v. Arnold, 380 F.2d 366 (4th Cir. 1967), where the defendant at Roanoke, Virginia, telephoned to the publisher at Fort Worth, Texas, a subscription to "Football Forecasts," which were mailed weekly to the defendant, who copied the information onto football parlay cards distributed to persons interested in betting on the outcomes of games. The defendant was convicted under §§ 1952 and 1953. The court held Forecasts to be exempt under § 1953 and, without any further discussion, held, "If Forecasts is not within the ban of § 1953, then the use of the telephone to order its transmittal through the mail is not the use of a 'facility'" under § 1952. 380 F.2d at 368. In view of the contrary holdings we have discussed and the lack of any precedent or reasoning in the *Arnold* case, we find its bald conclusion to be a non sequitur and decline to follow it.

■■ We conclude that a newspaper or similar publication exempt from the operation of § 1953 may nevertheless be used as an interstate facility to facilitate the carrying on of unlawful gambling activity under § 1952. Consequently, the trial court in each of the five cases properly denied the defendants' motions to dismiss the indictments.

### III

■ In four of the appeals (No. 18762 excepted) an issue is raised over the failure to give instructions that the crimes charged required proof of specific intent before the defendants could be convicted. As a corollary, it is also argued that the trial court erred in instructing the jury that the government must prove beyond a reasonable doubt that the defendants used or caused the use of a facility in interstate commerce with specific intent to further an enterprise involving gambling in violation of Indiana laws, but "the government is not required to prove that the defendants specifically intended to violate a federal law."

The same argument was made and rejected in the *Miller* case, 379 F.2d 483 (7th Cir.), cert. denied, 389 U.S. 930, 88 S.Ct. 291, 19 L.Ed.2d 281 (1967), where Judge Cummings said (379 F.2d, page 486):

"[The defendants] insist that the jury should have been instructed that ignorance on their part that they were violating a Federal law was a relevant factor in determining whether they were guilty. In a well-reasoned opinion, the District Judge rejected this construction of Section 1952. We approve his conclusion that 'the use of a facility in interstate commerce is a necessary jurisdictional element of an offense under Title 18 U.S.C. § 1952 but that no specific mental element or specific intent * * * need be shown with reference to such use' (258 F. Supp. at p. 812). Similarly, in Turf Center, Inc. v. United States, 325 F. 2d 793, 797 (9th Cir. 1963), the District Court instructed the jury that Section 1952 only requires intent to violate State law, and the Ninth Circuit approved the instruction without also requiring an intent to violate the Federal law."

*See also* United States v. Lookretis, 422 F.2d 647, 651 (7th Cir.), cert. denied, 398 U.S. 904, 90 S.Ct. 1693, 26 L.Ed.2d 63 (1970).

We conclude that the trial court gave the correct instructions governing intent in each case.

### IV

■ In appeal No. 18761, the defendants contend that the trial court erred

in refusing to give an instruction that, since there was no evidence that the defendants used the railroad, the only question remaining for the jury to determine was whether the defendants caused its use. The defendants cite no authority to support such an instruction, nor do they give any cogent reason why the failure to give the instruction resulted in any prejudice to them.

The instructions given by the court stated in great detail the elements of the offense required to be proved by the government beyond a reasonable doubt, including the requirement that the defendants used or caused to be used a facility in interstate commerce.

Under the facts of this case the jury could have found that the defendants' daily pickup of the scratch sheets at the railroad station constituted using or causing to use [4] the facilities of the railroad; in either case the defendants would have been guilty. The defendants' proferred instruction was obviously erroneous since it did not appear as a matter of law or uncontroverted fact that the defendants did not "use" the facilities under these circumstances; singling out "causing to use" would have been improper.

### V

In appeal No. 18764, the defendant urges as a ground for reversal the failure of the trial court to give an instruction on the burden of proof on his defense of alibi,[5] citing United States v. Marcus, 166 F.2d 497 (3rd Cir. 1948).

The defendant Frank Kelly's evidence relating to the alleged alibi included his own testimony that he and Raymond Goodman, who had been a bookmaker for 20 years, were partners in a bookmaking enterprise beginning in January, 1968; that the Illinois Sports News was bought by Goodman and used at the partnership establishment; that sometime during the middle of August, 1968, he made a "break" with Goodman and left the entire business to him without being compensated; that in the latter part of August he went to Las Vegas, Nevada, and stayed there the entire month of September; and that he moved permanently to Las Vegas on November 6, 1968. The government adduced the testimony of an FBI agent that Kelly was present in the gambling establishment and accepted a bet on September 5, 1968, one of the days set forth in the indictment. The agent identified Kelly sitting in the courtroom as the same man he had seen on September 5, 1968. A friend of Kelly and her nephew testified that Kelly was in Las Vegas with them from September 3 to about September 25, 1968. Both of these witnesses had been friends of Kelly for about 30 years.

Kelly admitted on cross examination that during the month of October he visited the gambling establishment to see how it was being run, to collect money owed to him by Goodman, and to collect money which his customers "owed to the establishment." Goodman repeatedly referred to Kelly as "the boss"; on September 5 he told the FBI agent "here

---

4. Each indictment charged the defendants with violation of 18 U.S.C. § 2, as well as of § 1952. Section 2 provides in part:
   "Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

5. Defendant's Requested Instruction No. 3:
   "The defendant has introduced evidence that he was not present at the time and place the overt act of September 5, 1968 was committed. This is known in law as the defense of 'Alibi'.

   Alibi is a legal and proper defense. The accused does not have the burden of establishing an alibi, but the government must establish every element of the crime beyond a reasonable doubt, including the defendant's presence at the time and place the overt act was allegedly committed by him. If after weighing the evidence in support of the alibi with all the facts and circumstances in the case, the jury has a reasonable doubt that the prosecution has proven that defendant was present at the time and place the overt act was committed, it should find the defendant not guilty."

comes the boss" as Kelly approached the establishment.

Where the evidence intended to establish an alibi is not strong, the failure to instruct the jury upon the burden of proof in regard to the alibi is not error if the jury is instructed that the government must establish every element of the crime beyond a reasonable doubt, which was done here. Guthrie v. United States, 92 U.S.App.D.C. 361, 207 F.2d 19, 24 (1953); United States v. Coduto, 284 F.2d 464, 469 (7th Cir. 1960), cert. denied, 365 U.S. 881, 81 S.Ct. 1027, 6 L.Ed.2d 192 (1961).

[6] In the case of the ordinary crime, one of the elements to be proved is the presence of the criminal at the time of the crime. Presence is not an element under § 1952. Being the operator or proprietor of the betting establishment utilizing the interstate facility is sufficient to result in a conviction under § 1952 regardless of presence at any particular time. United States v. Miller, 379 F.2d 483, 485, 487 (7th Cir.), cert. denied, 389 U.S. 930, 88 S.Ct. 291, 19 L.Ed.2d 281 (1967). Here Kelly's own admissions showed that he was still the owner or co-owner of the business after the date of the crime.

## VI

It is difficult to determine from the briefs filed by the defendants in Nos. 18764, 18765 and 71–1140 exactly what their contention is in regard to the instructions on conspiracy. In each case, the trial court gave a detailed conspiracy instruction.

Although the defendants' requested instruction in each case was considerably shorter than that given by the trial court, virtually every phrase in the requested instruction was also in the instruction given by the court with the exception that where the court used the word "law" the defendants used the words "federal law." For example, whereas the court instructed the jury that "[a] conspiracy is a combination of two or more persons to accomplish an unlawful purpose, or a lawful purpose by unlawful means," the defendants proffered "[a] conspiracy is a combination of two or more persons to accomplish the violation of a federal law." ·

As part of the court's instructions, the entire indictment in each case was read, showing each count to be based upon federal law; the pertinent parts of the specific federal laws involved, 18 U.S.C. § 371, § 1952 and § 2, were read; the essential elements of the primary substantive federal law involved (§ 1952) were defined; and the instructions as a whole were clear and complete.

Apparently the defendants' strategy in seeking to have the conspiracy instruction unnecessarily repeat "federal law" several times was to cause the jury to confuse the conspiracy charge with their contention that under the substantive § 1952 charges the government was required to prove their specific intent to violate a federal law, a contention which we have rejected in this opinion (III, *supra*).

We conclude that the conspiracy instructions given in Nos. 18764, 18765 and 71–1140 were proper and the trial court did not err in any of the cases in refusing to give the defendants proffered instructions on that subject.

## VII

The final contention in all but one of the cases (No. 18764 excepted) is that the trial court erred in denying the defendants' motions for judgments of acquittal because there was "nothing to show that defendants caused the use of an interstate facility in furtherance of gambling."

As noted in II above, in *Miller* we held, "Section 1952 does not require that the ticker be essential to the gambling operation; it need only 'facilitate' the carrying on of the illegal gambling" and "[w]ith defendants' knowledge and approval, their customers promoted the pool by posting the scores obtained from the tickertape," which activities constituted the use of an interstate facility by the defendants. 379 F.2d at 485, 486.

The defendants state that, when a motion for acquittal is made, the duty of the trial judge (and therefore the court of appeals on appeal) is to determine whether substantial evidence, taken in the light most favorable to the government, tends to show the defendants guilty beyond a reasonable doubt. United States v. Thayer, 209 F.2d 534 (7th Cir. 1954).

In each of these cases, the evidence of the widespread use of the Illinois Sports News by the betting patrons as well as by the defendants and their employees, the importance of the early arrival of the sheets in advance of the daily newspapers so that betting could begin, the drastic decrease in the number of sheets sent to Hammond by Illinois Sports News after the bookmaking operations were shut down, and the clandestine method by which each defendant obtained the sheets without directly subscribing to the publication by sending an emissary to the railroad station to extract copies and leave money, constituted substantial evidence upon which the jury could determine that the defendants caused the use of interstate facilities, well within the standards fixed in *Miller*.

The convictions in all five cases are affirmed.